BATH IRON WORKS CORP. ET AL. *v.* DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, ET AL.

No. 91–871.   Argued November 4, 1992—Decided January 12, 1993

STEVENS, J., delivered the opinion for a unanimous Court.

*Kevin M. Gillis* argued the cause for petitioners. With him on the briefs was *Allan M. Muir.*

*Christopher J. Wright* argued the cause for the federal respondent. With him on the brief were *Solicitor General Starr, Deputy Solicitor General Mahoney, Allen H. Feldman, Nathaniel I. Spiller,* and *Elizabeth Hopkins. Ronald W. Lupton* argued the cause and filed a brief for Ernest C. Brown, respondent under this Court's Rule 12.4.

JUSTICE STEVENS delivered the opinion of the Court.

Respondent Ernest C. Brown, a former employee of petitioner Bath Iron Works Corp., learned after he retired that he suffered from a work-related hearing loss. The parties agree that under the Longshore and Harbor Workers' Compensation Act (LHWCA or Act), 44 Stat. 1424, as amended, 33 U. S. C. § 901 *et seq.,* respondent is entitled to disability benefits on account of his injury. They disagree, however, as to the proper method of calculating those benefits.

There are essentially three "systems"[1] for compensating partially disabled workers under the Act, two of which are at issue in this case. The "first" system provides for com-

---

[1] The various methods for calculating benefits under the Act were so labeled by the Court of Appeals, and the parties retain that characterization in their briefs before this Court. We find that characterization useful and adhere to it in our discussion of the Act.

pensation for partially disabled claimants who have suffered certain statutorily "scheduled" injuries, one of which is hearing loss. The "third" system provides for compensation for retirees who suffer from occupational diseases that do not become disabling until after retirement. In most, but not all, cases, benefits for scheduled injuries are more generous than those provided retirees suffering from latent occupational diseases. The question presented in this case is whether a claimant who discovers, after retirement, that he suffers from a work-related hearing loss should be compensated under the first system, because loss of hearing is a scheduled injury, or under the third system, because he did not become aware of the disabling condition until after retirement.

I

Prior to 1984, the LHWCA provided that compensation for a permanent partial disability should be determined in one of two ways. If the injury was of a kind specifically identified in the schedule set forth in § 8(c) of the Act, 33 U. S. C. §§ 908(c)(1)–(20) (1982 ed.), the injured employee was entitled to two-thirds of his average weekly wage at the time of the injury for a specific number of weeks, regardless of whether his earning capacity had actually been impaired. See *Potomac Electric Power Co.* v. *Director, Office of Workers' Compensation Programs,* 449 U. S. 268, 269–270 (1980).[2] Loss of hearing was among those specified injuries.[3] In all other cases, the Act authorized compensation equal to two-thirds of the difference between the employee's average

---

[2] For example, workers who lose an arm are entitled to two-thirds of their weekly pay for 312 weeks, 33 U. S. C. § 908(c)(1), whereas workers who lose a leg are entitled to such compensation for 288 weeks, § 908(c)(2).

[3] Section 8(c)(13), both before and after the LHWCA Amendments of 1984, authorized compensation of two-thirds of the average weekly wage for a period of 200 weeks for a total loss of hearing in both ears. For a partial loss of hearing, the Act requires a proportionate reduction in benefits. See n. 9, *infra.*

weekly wage and his postinjury earning capacity. 33 U. S. C. § 908(c)(21). In those cases, unlike the scheduled-injury cases in which disability was presumed, it was necessary for the employee to prove that his injury had actually decreased his earning capacity.[4]

In early 1984, the Benefits Review Board[5] was confronted with a case in which the claimant had contracted asbestosis, a latent occupational disease that did not manifest itself until after his retirement. Because the disease did not qualify as a scheduled benefit, the claimant was not entitled to a presumption of disability; moreover, because it did not affect his actual earnings, he could not establish "disability" as defined in § 902(10).[6] Therefore, the Board held, the claimant was not entitled to any compensation under the Act. *Aduddell* v. *Owens-Corning Fiberglass*, 16 BRBS 131, 134 (1984).[7] Three weeks after the *Aduddell* decision, the Board followed

---

[4] Prior to 1984, § 902(10) defined the term "disability" to mean "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." 33 U. S. C. § 902(10) (1982 ed.). An employee with a scheduled injury, however, is presumed to be disabled, even though the injury does not actually affect his earnings. As we held in *Potomac Electric Power Co.* v. *Director, Office of Workers' Compensation Programs*, 449 U. S. 268 (1980), such an employee is only entitled to the scheduled benefit even when the actual impairment of his earnings would have produced a higher benefit if calculated under § 8(c)(21). *Id.*, at 270–271.

[5] The Benefits Review Board was created by Congress to "hear and determine appeals . . . with respect to claims of employees under [the Act]." 33 U. S. C. § 921(b)(3).

[6] See n. 4, *supra*.

[7] See also *Worrell* v. *Newport News Shipbuilding & Dry Dock Co.*, 16 BRBS 216 (1983) (Administrative Law Judge (ALJ) decision denying death benefits where claimant who had been exposed to asbestos developed and died from mesothelioma after retirement); *Newport News Shipbuilding and Dry Dock* v. *Director, Office of Workers' Compensation Programs*, 681 F. 2d 938, 942 (CA4 1982) ("Before retirement, the asbestosis was not disabling; after retirement there was no diminished capacity").

its reasoning in a case involving a hearing loss claim filed after the claimant's retirement. *Redick* v. *Bethlehem Steel Corp.*, 16 BRBS 155 (1984). Although the ALJ in *Redick* had made a finding of disability because "scheduled awards are conclusive presumptions of loss of wage-earning capacity and cannot be rebutted," *id.*, at 156, the Board vacated the award of benefits, reasoning that the "voluntary retirement was prior to manifestation of the injury, and was unrelated to his hearing loss," *id.*, at 157.

In 1984, Congress amended the Act by adding the "third" compensation system that unquestionably provides compensation for the type of claim rejected in *Aduddell* and the other asbestos cases. With the 1984 amendments, Congress authorized the payment of benefits to retirees suffering from occupational diseases that become manifest only after retirement. More precisely, a new § 10(i) addresses claims for death or disability "due to an occupational disease which does not immediately result in death or disability." 33 U. S. C. § 910(i).

As is the case under the first two compensation systems, compensation under the third system turns in large part on the "average weekly wage" used to calculate benefits. When the "time of injury"—defined as "the date on which the employee or claimant becomes aware, or . . . should have been aware, of the relationship between the employment, the disease, and the death or disability," *ibid.*—is within the first year of retirement, the claimant's average weekly wage is based upon the claimant's wages just prior to retirement. § 910(d)(2)(A). When the "time of injury" is more than one year after retirement, the average weekly wage is deemed to be the national average weekly wage at that time. § 910(d)(2)(B).

Once the "average weekly wage" is determined, a claimant's benefits are calculated under § 8 of the Act. For claims

in which "the average weekly wages are determined under section 910(d)(2)," that is, for retirees with claims involving "an occupational disease which does not immediately result in death or disability," 33 U. S. C. § 910(i), a new § 8(c)(23) provides that compensation shall be two-thirds of the applicable average weekly wage multiplied by the percentage of permanent impairment as determined by particular medical guides specified in the statute, 33 U. S. C. § 908(c)(23). The claimant is entitled to such benefits for the duration of the impairment. *Ibid.*[8]

---

[8] Piecing all these various provisions together, § 8(c), 33 U. S. C. § 908(c), provides:

"Permanent partial disability: In case of disability partial in character but permanent in quality the compensation shall be 66⅔ per centum of the average weekly wages, . . . and shall be paid to the employee, as follows:

"(13) Loss of Hearing:

"(B) Compensation for loss of hearing in both ears, two-hundred weeks.

"(21) Other cases: In all other cases in the class of disability, the compensation shall be 66⅔ per centum of the difference between the average weekly wages of the employee and the employee's wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of partial disability.

"(23) Notwithstanding paragraphs (1) through (22), with respect to a claim for permanent partial disability for which the average weekly wages are determined under section 910(d)(2) of this title, the compensation shall be 66⅔ per centum of such average weekly wages multiplied by the percentage of permanent impairment, as determined under the guides referred to in section 902(10) of this title, payable during the continuance of such impairment."

Section 10(d), 33 U. S. C. § 910(d), provides:

"(2) Notwithstanding paragraph (1), with respect to any claim based on a death or disability due to an occupational disease for which the time of injury (as determined under subsection (i) of this section) occurs—

"(A) within the first year after the employee has retired, the average weekly wages shall be one fifty-second part of his average annual earnings during the 52-week period preceding retirement; or

The differences between the first and third compensation systems can result in significantly differing benefits. An award to a claimant under the schedule, *i. e.*, the first system, is based upon the degree of loss to the scheduled body part, whereas an award under the third system is based on the extent to which the "whole body" has been impaired. In most cases, this difference makes recovery under the schedule more generous than that under the retiree provisions.[9]

## II

Respondent was exposed to loud noise during his employment as a riveter and chipper at petitioner's iron works from 1939 until 1947, and again from 1950 until his retirement in 1972. In 1985 he received the results of an audiogram indicating an 82.4 percent loss of hearing. As authorized by a

"(B) more than one year after the employee has retired, the average weekly wage shall be deemed to be the national average weekly wage . . . applicable at the time of the injury."

Section 10(i), 33 U. S. C. § 910(i), provides:

"For purposes of this section with respect to a claim for compensation for death or disability due to an occupational disease which does not immediately result in death or disability, the time of injury shall be deemed to be the date on which the employee or claimant becomes aware, or in the exercise of reasonable diligence or by reason of medical advice should have been aware, of the relationship between the employment, the disease, and the death or disability."

[9] For example, because respondent's hearing loss is partial (82.4 percent), see *infra* this page, his recovery under the schedule would be reduced from two-thirds of his average weekly wage for 200 weeks to the same amount for 165 weeks (200 weeks times .824 equals 165 weeks). See 33 U. S. C. § 908(c)(19). Under the guides referenced in § 8(c)(23), however, an 82.4 percent hearing loss translates into a 29 percent impairment of the "whole person." Thus, under the third system respondent would only receive 29 percent of two-thirds of the appropriate average weekly wage.

There are some aspects of the third system, however, that may provide for more favorable treatment to claimants. For instance, benefits calculated pursuant to the third system are paid weekly for as long as the claimant is impaired, whereas benefits for a scheduled injury continue only for a specified number of weeks.

provision in the 1984 amendments that is not at issue in this case,[10] he then filed a timely claim for benefits.

The ALJ, following Board precedent, applied a hybrid of the first and third compensation systems to calculate respondent's benefits. The ALJ concluded that respondent's hearing loss fell within the scope of the 1984 amendments as an occupational disease that does not immediately result in disability and that the relevant "time of injury" was the date in September 1985 when respondent received his audiogram and became aware of his hearing loss. Accordingly, the ALJ identified the national average weekly wage in September 1985 as the relevant average weekly wage. At that point, however, the ALJ departed from the third system; instead of applying the formula in § 8(c)(23) applicable to claims for latent occupational diseases, he turned to the first system, the schedule in § 8(c)(13), to calculate respondent's weekly benefit. Respondent's benefits were thus limited to a precise number of weeks, as opposed to continuing throughout the duration of his disability as would be required under § 8(c)(23). Yet, because of the differing formulas used in §§ 8(c)(23) and 8(c)(13), the *amount* of each weekly benefit was higher than it would have been had respondent's benefit been calculated under § 8(c)(23).[11] The Benefits Review Board affirmed on the same rationale.

On appeal, petitioners (the employer and its insurance carrier) agreed with the ALJ and the Board that respondent suffers from a latent occupational disease within the meaning of § 10(i), but argued that the ALJ and the Board erred in

---

[10] Title 33 U. S. C. § 908(c)(13)(D) provides:

"The time for filing a notice of injury, under section 912 of this title, or a claim for compensation, under section 913 of this title, shall not begin to run in connection with any claim for loss of hearing under this section, until the employee has received an audiogram, with the accompanying report thereon, which indicates that the employee has suffered a loss of hearing."

[11] See n. 9, *supra*, and accompanying text.

failing to apply the benefit formula in § 8(c)(23) appropriate to such claims. While petitioners challenged the method of computing the benefit, they did not contest the use of 82.4 percent as the measure of Brown's hearing loss, even though the record contains persuasive evidence that a portion of that loss is attributable to the aging process after his retirement.

The Director of the Department of Labor's Office of Workers' Compensation Programs challenged the ALJ's and the Board's reasoning on different grounds. The error they made, the Director argued, was in looking to the third compensation system at all, for hearing loss is not an occupational disease that "does not immediately result in death or disability." 33 U. S. C. § 910(i). Relying on undisputed scientific evidence, the Director argued that work-related hearing loss, unlike a disease such as asbestosis, *does* cause immediate disability:

> "[D]eafness is an injury that a worker typically suffers *before* retirement. After retirement a worker's workplace-noise-induced deafness will not ordinarily grow worse; if anything it will get better. See R. T. Sataloff & J. Sataloff, *Occupational Hearing Loss* 357 (1987). Moreover, unlike asbestosis, the symptoms of deafness occur simultaneously with the 'disease.' In other words, to say that a worker is '84.4% deaf' is to say that he has lost 84.4% of his hearing. If he does not notice his deafness, and does not file a claim until long after retirement, that fact does not mean he is not deaf; it does not mean he has no deafness symptom; rather, it means he may have grown accustomed to his deafness, which is quite a different matter." 942 F. 2d 811, 816 (CA1 1991) (summarizing Director's argument).

Accepting the Director's undisputed characterization of occupational hearing loss, the Court of Appeals held that respondent's disability was not "due to an occupational disease which does not immediately result in . . . disability," 33

U. S. C. § 910(i), and that therefore his claim did not fall within the third compensation system. "[U]sing ordinary English," the court noted, "one would normally say that deafness is a disease that causes its symptoms, namely loss of hearing, *simultaneously with its occurrence.* One simply cannot say that a person suffering from deafness is not deaf—whether or not he notices how deaf he is." 942 F. 2d, at 817 (emphasis added). Having ruled out application of the third compensation system, the court found that respondent's claim fell squarely within the first system, which draws no distinction between retired and working claimants and expressly provides for compensation for work-related hearing loss. The court thus affirmed the Board's result—application of the benefit calculation formula for scheduled injuries in § 8(c)(13)—but rejected its reliance on the third compensation system for latent occupational diseases.[12]

The Courts of Appeals for the Fifth and Eleventh Circuits have reached the opposite conclusion. While both courts have agreed with the court below in rejecting the Board's "hybrid" approach, they have both held, in contrast to the decision below, that a retiree's claim for occupational hearing loss is "a claim for compensation for . . . disability due to an occupational disease which does not immediately result in . . . disability," 33 U. S. C. § 910(i), and therefore should be compensated under the retiree provisions enacted in 1984. See *Ingalls Shipbuilding* v. *Director, Office of Workers' Compensation Programs,* 898 F. 2d 1088 (CA5 1990); *Alabama Dry Dock and Shipbuilding Corp.* v. *Sowell,* 933 F. 2d

---

[12] The Board did not *fully* apply the benefit calculation for scheduled injuries. Instead of using the average weekly wage at the time respondent was injured, it used the national average weekly wage in September 1985, the average weekly wage that would be appropriate had respondent in fact suffered from "an occupational disease which does not immediately result in death or disability." 33 U. S. C. § 910(i). See *supra,* at 160. Petitioners did not raise the issue below and the Court of Appeals considered it waived. 942 F. 2d, at 819. We do as well.

1561 (CA11 1991). We granted certiorari to resolve the conflict. 503 U. S. 935 (1992). We now affirm.

## III

Petitioners do not dispute the Director's or the lower court's characterization of occupational hearing loss, and we find no basis for doing so ourselves. Once we accept that characterization, it follows that the retiree provisions enacted in 1984—the so-called "third" compensation system—do not apply to claims for occupational hearing loss. Occupational hearing loss, unlike a long-latency disease such as asbestosis, is not an occupational disease that does not "immediately result in . . . disability." 33 U. S. C. § 910(i). Whereas a worker who has been exposed to harmful levels of asbestos suffers no injury until the disease manifests itself years later, a worker who is exposed to excessive noise suffers the injury of loss of hearing, which, as a scheduled injury, is presumptively disabling, simultaneously with that exposure. Because occupational hearing loss *does* result in immediate disability, the plain language of § 10(i) leads to the conclusion that a retiree's claim for occupational hearing loss does not fall within the class of claims covered by the third compensation system.

The Courts of Appeals for the Fifth and Eleventh Circuits recognized the crucial distinction between occupational hearing loss and latent diseases such as asbestosis, but nonetheless concluded that Congress, in enacting the third compensation system, did not intend to distinguish between the different types of occupational diseases suffered by retirees. In particular, these courts were concerned that if a retiree's claim for occupational hearing loss was not deemed to be a claim with respect to "an occupational disease which does not immediately result in . . . disability," then the Act would be silent as to the appropriate "time of injury" for such a claim. That is, if the "time of injury" for a retiree's claim of occupational hearing loss is not "the date on which the em-

ployee or claimant becomes aware, or . . . should have been aware, of the relationship between the employment, the disease, and the death or disability," then when is it?[13] To the Director's response that in the case of occupational hearing loss the time of injury is the date on which the disabling condition is complete, that is, the date of last exposure to the workplace noise, both courts found that the "date of last exposure" rule had been rejected by other courts and by Congress and therefore should not be resurrected absent some indication of congressional intent to do so. *Ingalls*, 898 F. 2d, at 1093–1094; *Sowell*, 933 F. 2d, at 1566–1567.

We do not find the reasoning of these courts persuasive for two reasons. First, the statute provides that the retiree provisions apply not to every occupational disease, but just to an occupational disease *"which does not immediately result in . . . disability."* 33 U. S. C. § 910(i) (emphasis added). Asbestosis is such a disease; hearing loss is not. In ignoring the fact that occupational hearing loss *does* immediately result in disability, the Courts of Appeals for the Fifth and Eleventh Circuits have essentially read that key phrase out of the statute. Congress certainly could have enacted a compensation system that treated retirees differently from current workers in *all* cases, regardless of the nature of the particular occupational disease from which they suffered. As we read the statute, however, that is not the path Congress took.

Second, while it is true that prior to the 1984 amendments some courts had rejected fixing the time of injury, and thus the applicable average weekly wage, as the date of last exposure to the harmful substance, those cases involved long-latency diseases such as asbestosis. See, *e. g.*, *Todd Ship-*

---

[13] As explained above, the average weekly wage used to calculate benefits under the Act is the wage that the claimant was receiving at the time of injury. Thus, in order to calculate benefits under the Act, one must be able to identify the appropriate time of injury.

*yards Corp.* v. *Black*, 717 F. 2d 1280 (CA9 1983). In such cases, using the date of last exposure as the relevant time of injury was deemed inappropriate because, according to ordinary understanding, a worker is not injured at that time; the injury arises years later when the disease manifests itself. *Id.*, at 1290 ("The average person . . . would not consider himself 'injured' merely because the [asbestos] fibers were embedded in his lung"). For the reasons explained above, the same cannot be said about occupational hearing loss. The injury, loss of hearing, occurs simultaneously with the exposure to excessive noise. Moreover, the injury is complete when the exposure ceases. Under those circumstances, we think it quite proper to say that the date of last exposure—the date upon which the injury is complete—is the relevant time of injury for calculating a retiree's benefits for occupational hearing loss.

Nor are we persuaded by petitioners' arguments as to why retiree claims for occupational hearing loss should be compensated pursuant to the third compensation system. Petitioners correctly point out that even though the portion of a retiree's hearing loss that is attributable to his occupation may remain constant after retirement, the aging process may cause it to worsen during retirement. In our view, however, this is a matter that is relevant to the computation of the amount of the benefit—a matter that is not in dispute in this case[14]—rather than to the retiree's eligibility for a scheduled benefit. To the extent there is any unfairness in the statutory scheme in that employers may be liable for hearing loss attributable to aging, employers can protect themselves by providing their employees with an audiogram at the time of retirement and thereby freezing the amount of compensable hearing loss attributable to the claimant's employment.

---

[14] See *supra*, at 161.

Petitioners also point out, again correctly, that during debate on the 1984 amendments a Senator made a passing reference to the *Redick* case and suggested that the House and Senate conferees disagreed with the Board's decision in that case. 130 Cong. Rec. 26300 (1984) (statement of Sen. Hatch). Because that was a hearing loss case, they infer that the retiree provisions of the amendment should be construed to apply to such cases. In addition to the fact that the conclusion does not necessarily follow from the premise, we reject the argument for two reasons, each of which is sufficient. First, when carefully read, we find the text of the statute unambiguous on the point at issue; accordingly, we give no weight to a single reference by a single Senator during floor debate in the Senate. Second, as part of the 1984 amendments, Congress amended § 8(c)(13) to preserve the timeliness of hearing loss claims filed more than a year after the employee's last exposure.[15] It accomplished that purpose not by postponing the time of injury until the date of awareness, but, on the contrary, by providing that the "time for filing a . . . claim for compensation . . . shall not begin to run in connection with any claim for loss of hearing under this section . . . until the employee has received an audiogram . . . ." 33 U. S. C. § 908(c)(13)(D). Thus, Congress responded to its concern about latent diseases that are not scheduled and cause no loss of earnings by enacting the interrelated provisions constituting the "third" compensation system, whereas it responded to a concern about hearing loss claims by amending § 8(c)(13).

## IV

For the reasons given, we hold, as did the court below, that claims for hearing loss, whether filed by current workers or retirees, are claims for a scheduled injury and must be

---

[15] See n. 10, *supra.*

compensated pursuant to §8(c)(13) of the LHWCA, not §8(c)(23).[16]

The judgment of the Court of Appeals, accordingly, is affirmed.

*It is so ordered.*

---

[16] In so holding, we reject respondent employee's arguments in support of the Board's hybrid approach. There is simply no basis in the statute for combining the compensation provisions applicable for retirees suffering from latent occupational diseases with those governing claimants with scheduled injuries. We note that even the Board has now receded from that interpretation of the Act. See *Harms* v. *Stevedoring Services of America,* 25 BRBS 375, 382 (1992) ("Where claimant is a retiree and Section 10(i) applies, the plain language of the statute renders the provisions of Section[s] 8(c)(1)–(22), including Section 8(c)(13), inapplicable").