**PORT OF PORTLAND; Helmsman Northwest, Petitioners,**

v.

**DIRECTOR, OFFICE OF WORKERS COMPENSATION PROGRAMS, & Department of Labor, Respondents.**

No. 98–70492.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 13, 1999.

Decided Sept. 27, 1999.

---

**2.** *United States v. Cardenas–Alvarez*, 987 F.2d 1129, 1133 (5th Cir.1993).

Robert E. Babcock, Lake Oswego, Oregon, for the petitioners.

Joshua Gillelan and Sandra Falzone, United States Department of Labor, Washington, D.C.; Meagan A. Flynn, Pozzi Wilson & Atchison, Portland, Oregon, for the respondents.

Before: FLETCHER, FERGUSON and TASHIMA, Circuit Judges.

FERGUSON, Circuit Judge:

■ Donald Ronne ("Ronne") filed a claim for disability benefits under the Longshore and Harbor Workers' Compensation Act (LHWCA or "Act"), 33 U.S.C. §§ 901 *et seq.*, for an injury to his knee that eventually led to total permanent disability. After a hearing, the administrative law judge determined, *inter alia*, that Ronne's disabling back condition was a "natural and unavoidable result" of the earlier knee injury, and therefore Ronne's compensation should be based on his average weekly wage at the time of the knee injury. The Benefits Review Board ("Board") affirmed. Port of Portland filed this petition for review, claiming that Ronne's benefits should be calculated as of the time total disability became manifest, not at the time he first suffered the injury. We hold that, where an employee's total disability naturally progresses from a single accidental injury, the employee should be compensated at the average weekly wage rate as of the time of the accident if he cannot return to his former employment after that time.

## I. BACKGROUND

Donald Ronne had worked as a longshoreman since 1953, most recently for Port of Portland. On December 5, 1988, Ronne suffered a knee injury while working on the deck of a vessel. He temporarily ceased working and underwent surgery. Dr. Ira Weintraub, the doctor who performed the surgery, released Ronne to work at full duty in August 1989, although noting that he suffered a 20% permanent knee impairment.

Ronne's return to work, however, was short-lived. On October 29, 1989, while

climbing a crane, he suffered severe knee pain. This new injury again forced him to stop working. Dr. Weintraub never released Ronne to return to longshore work, and he has not returned to any type of work since the injury. Ronne underwent two more knee surgeries over the next two years. The last one was performed on March 4, 1992.

By July 1992, Ronne started complaining about lower back pain. The pain persisted throughout 1993. Ronne, then age 64, tried to find work either as a security guard or a parking lot attendant, but met with no success. In December 1993, Dr. Weintraub interpreted an MRI scan as showing "some broad-based disc bulging." Ronne was referred to a neurosurgeon, Dr. Mason, who diagnosed him with a narrowing of the lumbar canal and with a probable herniated disc. Both Dr. Mason and Dr. Weintraub shared the opinion that Ronne's back problem resulted from his knee injury, which caused him to walk with an awkward gait. Ronne elected to treat his back conservatively with physical therapy, although Dr. Mason had recommended surgery.

Ronne then filed this claim for benefits under the LHWCA. The parties stipulated that (1) Ronne could not return to waterfront work after his October 1989 knee injury; (2) his average weekly wage at the time of his first knee injury in 1988 was $963.64; and (3) his back condition was a secondary result or consequence of his 1989 knee injury. The ALJ concluded that Ronne was totally disabled after his third knee surgery on March 4, 1992 and could not perform any work. However, the ALJ found, between November 29, 1990 and March 4, 1992, Ronne could have found and performed suitable alternative work in the area as a parking lot attendant or a security guard. The ALJ granted benefits to Ronne for periods of temporary and partial permanent disability prior to March 4, 1992.[1] The judge also granted total disability benefits to Ronne after March 1992 based on his average weekly wage at the time of his second knee injury in 1989.[2] The ALJ determined that Ronne's average weekly wage in 1989 was $963.64 since Ronne did not suffer any decrease in earning capacity between the two knee injuries. It is only this latter award of total disability benefits that Port of Portland challenges here.

■ The ALJ held that Ronne's disabling back condition was not a distinct injury but a continuation of the October 1989 knee injury. Applying the Board's precedent in *Merrill v. Todd Pacific Shipyards Corp.*, 25 BRBS 140 (1991), the ALJ concluded that in "natural progression" cases, such as Ronne's, the average weekly wage is calculated as of the time of the initial traumatic injury. The Board affirmed, holding that the compensable injury was Ronne's knee injury, and therefore, benefits for the consequential back condition must be calculated based on his average weekly wage at the time of the knee injury. We review the Board's decision for errors of law and for its adherence to the substantial evidence standard for reviewing the ALJ's findings of fact. *See Alcala v. Director, OWCP*, 141 F.3d 942, 944 (9th Cir.1998).

## II. DISCUSSION

A. *Time of Injury*

■ Port of Portland argues that the Board's compensation decision is inconsis-

---

1. Specifically, the ALJ awarded Ronne temporary total disability compensation from December 6, 1988 to August 13, 1989 and from October 30, 1989 to November 29, 1990. On November 29, 1990, Dr. Weintraub released Ronne to perform "some more sedentary type work." Accordingly, the ALJ awarded Ronne permanent partial disability from that date until he became totally disabled following his third knee surgery.

2. The ALJ granted temporary total disability payments for the period from March 4, 1992 to April 8, 1994, the date on which Dr. Mason recommended back surgery for Ronne. The ALJ concluded that, by then, Ronne's back condition was of "infinite duration." He awarded permanent disability payments beginning at that time.

tent with this circuit's precedent and with the LHWCA, which requires that compensation for Ronne's knee injury be "factored out" of any award for total disability. Accordingly, Port of Portland contends that Ronne's benefits should be based on his projected earning capacity as a security guard or parking lot attendant at the time immediately preceding the manifestation of his back problem. That weekly wage is $170. The Director of the Office of Workers' Compensation Programs also rejects the Board's calculation of Ronne's award, but for a different reason. The Director urges us to consider Ronne's back condition an occupational disease, entitled to special provisions under the Act. Under these provisions, Ronne's benefits should be based on a national average weekly wage rate of $369.15.

The LHWCA uniformly sets both liability and compensation from the "time of injury." The Act provides that compensation shall be based on the injured worker's average weekly wage at the *time of the injury.* 33 U.S.C. §§ 908(a) and 910. Disability also is defined as the inability to earn wages that the employee was receiving at the *time of injury.* 33 U.S.C. § 902(10). The Act defines "injury" as "accidental injury ... arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally and unavoidably results from such accidental injury...." § 902(2). For occupational diseases that do not immediately result in disability, the Act defines "time of injury" as the date the claimant becomes aware or should have been aware of the relationship between his employment, the disease, and the disability. § 910(i). If the employee has been retired for longer than one year after this date, the average weekly wage is the national average weekly wage at that time. § 910(d)(2)(B). Unlike the provisions for occupational diseases, the Act does not define "time of injury" for accidental injuries. We have recognized, however, that in most cases of traumatic injury the date of injury and the

date of disability coincide. *See Johnson v. Director, OWCP,* 911 F.2d 247, 249 (9th Cir.1990) (citing *Todd Shipyards Corp. v. Black,* 717 F.2d 1280, 1288 (9th Cir.1983)).

Port of Portland contends that our decision in Ronne's case is controlled by *Johnson.* In that case, we held that the victim of a traumatic accident, like the victim of an occupational disease, should be compensated at the average weekly wage rate at the time his latent disability manifested itself, not at the time of the accident. *Id.* at 250. Margaret Johnson had fallen through an opening in a vessel, injuring her hands, wrist and hip. She continued to work for years afterward, despite some pain and swelling, but eventually had to cease work altogether.

We find *Johnson* distinguishable from the situation here. *Johnson* applied to a case where the disabling symptoms of an earlier accident did not appear for years after the accident. The court clearly analogized the manifestation of "latent and unknown injuries" in accidental injury cases to the rationale for making "time of injury" in occupational disease cases coincide with the manifestation of disability. *Id.* at 249. The court's reasoning was based chiefly on the fact that Johnson continued to work after her accidental injury, as is true for workers exposed to asbestos, for example. Without a rule extending the time of injury in occupational disease cases to latent accidental injuries, workers like Johnson would not receive the benefit of the higher wage they had accumulated because they could continue in their waterfront employment. *Id.* at 250. In other words, they had not suffered any decrease in earning capacity, or disability.

Ronne's situation is quite different from Johnson's, however. Ronne's disability, as the term is used in the LHWCA, was not latent since he suffered significant loss of earning capacity when he injured his knee in 1989. He was disabled from the moment he suffered that knee injury and was

never released to continue his employment as a longshoreman. Instead, his disability eventually became total and permanent when his back problem arose as a result of the knee. Accordingly, unlike Johnson, his income at the time of total disability was significantly less than his income at the time of his partial knee disability. The fact that he could have received a substantially lower wage in some other job before his back symptoms arose does not involve *Johnson*'s rationale of encouraging workers to return to the *same* employment.

Rather, Ronne's case is more like the claimant's occupational hearing loss in *Bath Iron Works Corp. v. Director, OWCP*, 506 U.S. 153, 113 S.Ct. 692, 121 L.Ed.2d 619 (1993). In *Bath Iron Works*, the Supreme Court considered how benefits should be calculated when a worker retired and later learned that he suffered from work-related hearing loss. The Court accepted the Director's characterization of latent hearing loss as an injury which occurs simultaneously with disability, that is, it is presumptively disabling. *Id.* at 163–64, 113 S.Ct. 692. The Court approved of setting "time of injury" for compensation purposes as of the date of last exposure to the excessive noise, rather than the date of manifestation of hearing loss symptoms. *Id.* at 164–65, 113 S.Ct. 692. *See also Ramey v. Stevedoring Servs. of Am.*, 134 F.3d 954, 962 (9th Cir. 1998) (endorsing date of last exposure over date of diagnosis). Ronne's knee injury, like occupational hearing loss, is a "scheduled" injury and therefore presumptively disabling on the day of his fall. Unlike the circumstances in *Johnson*, Ronne's disability occurred at the time of the accident. The injury was then "complete" in the sense that any exacerbation of the problem occurred naturally and unavoidably from that injury. *See Bath Iron Works*, 506 U.S. at 165, 113 S.Ct. 692. That is, Ronne's back symptoms were "irrevocably fixed" when he suffered the knee injury, even though they did not manifest themselves until he had been walking on the damaged knees for a period of time. *See*

*Bath Iron Works Corp. v. Director, OWCP*, 942 F.2d 811, 819 (1st Cir.1991). This is not a situation where the date of disability occurred much later. We find no reason that this analysis should change merely because the knee injury led to back problems and total disability years later.

Moreover, a "natural progression" rule that compensates traumatically injured employees from the time when they can no longer perform their former employment comports with common sense, with the LHWCA, and with the policies behind the Act. In other provisions of the Act, we and our sister circuits have distinguished "natural progression" cases for purposes of assigning liability to employers. In determining which employer is liable under the Act in cases of traumatic injury, for example, we have held: "If the disability resulted from the natural progression of a prior injury and would have occurred notwithstanding the subsequent injury, then the prior injury is compensable and accordingly, the prior employer is responsible." *Foundation Constructors, Inc. v. Director, OWCP*, 950 F.2d 621, 624 (9th Cir.1991) (citing *Kelaita v. Director, OWCP*, 799 F.2d 1308, 1311 (9th Cir.1986)). Besides this so-called "last employer rule," we also have distinguished "aggravation" of injury cases from natural progression cases for purposes of determining the *extent* of an employer's liability, and hence the employee's compensation. *See Port of Portland v. Director, OWCP*, 932 F.2d 836, 839 (9th Cir.1991) (discussing the aggravation rule which compensates an employee for the entire resulting disability when an employment injury aggravates a pre-existing condition). *See also Jones v. Director, OWCP*, 977 F.2d 1106, 1110–12 (7th Cir. 1992) (aggravation of worker's injury was a "natural" result under the Act's definition of injury such that worker's original employer was not relieved from full liability).

■ Additionally, courts have applied natural progression principles in deciding

whether an employer is entitled to some financial relief under the special fund provision of the Act. *See* 33 U.S.C. § 908(f). A prerequisite to that relief is that the employee suffer a "second injury" or work-related aggravation of pre-existing condition. *See Transbay Container Terminal v. United States Dep't of Labor Benefits Review Bd.*, 141 F.3d 907, 910 (9th Cir. 1998); *Director, OWCP v. Todd Shipyards Corp.*, 625 F.2d 317, 319–20 (9th Cir.1980). But "[w]hen total disability results from nothing more than the *natural progression* of a preexisting partial disability, the total disability cannot be a second injury," prohibiting the employer from obtaining relief from the special compensation fund. *Jacksonville Shipyards v. Director, OWCP*, 851 F.2d 1314, 1316 (11th Cir.1988) (emphasis added). It is a truism that damages follow from liability. Thus, the logic of these natural progression cases should be extended to grant compensation at the time the worker no longer can perform his former employment because of partial disability, even when total disability "naturally" results later. This conclusion is supported by the "humanitarian purposes" of the LHWCA, as well as by our mandate to construe liberally its provisions to resolve all doubts in favor of claimants, even if some overcompensation results. *Matulic v. Director, OWCP*, 154 F.3d 1052, 1057 (9th Cir.1998). *See also Voris v. Eikel*, 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953) (the LHWCA "must be construed in conformance with its purpose, and in a way which avoids harsh and incongruous results").

### B. *Occupational Disease*

▮ In affirming the Board's natural progression rule, we reject the Director's position that Ronne's disabling back condition qualifies as an occupational disease. We accord considerable weight to the Director's construction of the LHWCA. *See Force v. Director, OWCP*, 938 F.2d 981, 983 (9th Cir.1991). Our deference, however, is limited because that interpretation is only a litigating position, not a regulation.

*See McGray Constr. Co. v. Director, OWCP*, 181 F.3d 1008, 1015–16 (9th Cir. 1999). Moreover, although the Director tries to frame its view of Ronne's back condition as a matter of statutory construction, it is more properly a factual issue to which we owe no agency deference. In any event, we cannot properly defer because the Director's overbroad definition of occupational disease is not reasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It does not comport with the generally accepted definition of occupational disease and is inconsistent with the structure of the LHWCA.

The Director contends that Section 2(2) of the Act sets out a separate category of occupational disease or infection that "naturally and unavoidably" arises from work-related accidental injuries. Ronne's "degenerative back disease," as the Director calls it, falls into such a category, and therefore he should receive compensation under the Act's special provisions for those diseases. The Act does not define occupational disease. However, its definition of injury is not "easily susceptible" to the Director's view. *See Force*, 938 F.2d at 984. The entire structure of the Act, as well as its definition of injury, clearly distinguish between "accidental" injuries and occupational diseases as injuries. The fact that the Act contemplates that an "occupational disease *or infection*" may result from accidental injury does not explain anything about what medical conditions qualify as occupational diseases, nor does it mean that Ronne's back condition is such a disease.

▮ Rather, workers' compensation law generally defines occupational disease as "any disease arising out of exposure to harmful conditions of the employment, when those conditions are present in a peculiar or increased degree by comparison with employment generally." *Gencarelle v. General Dynamics Corp.*, 892 F.2d

173, 176 (2d Cir.1989) (citing 1B A. Larson, *The Law of Workmen's Compensation* § 41.00, at 7–353). Nearly every court that has considered whether an injury under the Act is an occupational disease has accepted this definition, and so do we. *See LeBlanc v. Cooper/T. Smith Stevedoring, Inc.,* 130 F.3d 157, 160 (5th Cir.1997); *Liberty Mut. Ins. Co. v. Commercial Union Ins. Co.,* 978 F.2d 750, 752 n. 2 (1st Cir. 1992); *Gencarelle,* 892 F.2d at 176. The definition also comports with the generally accepted definition of "occupational" as "of, relating to, or caused by engagement in a *particular* occupation." *Webster's II New College Dictionary* (1995) (emphasis added). Thus, the disability must arise from conditions peculiar to the claimant's employment or particular line of work. *See also Director, OWCP v. General Dynamics Corp.,* 769 F.2d 66, 68 (2d Cir.1985) (where increased risks of a hazard peculiar to the nature of employment aggravate a preexisting condition, the resultant disability may be treated as an occupational disease). Ronne's back problem arose from walking on a knee that he injured at work and not from any conditions or activities particular to his job as a longshoreman.

The Director cites *Gardner v. Director, OWCP,* 640 F.2d 1385, 1389–90 (1st Cir. 1981) to support his position that Ronne's back condition is an occupational disease. There, the court addressed the employer's argument that the work-related aggravation of the employee's pre-existing varicose vein condition was neither an accidental injury nor an occupational disease within the meaning of the Act. The court rejected a cramped view of "accidental injury" that would read a forseeability requirement into the term, and did not reach the issue of whether Gardner's injury was an occupational disease. *Id.* at 1390 n. 3. The case does not speak to the relevant issues here and does not support the Director's position. In particular, Gardner's varicose vein aggravation did not result from an isolated accident at work, and the ALJ specifically found that particular conditions of employment, which required Gardner to stand, contributed to his total disability.

■ Instead, we find support for a slightly more restricted view of "accidental injury" and "occupational disease" under the Act in *Bath Iron Works,* 506 U.S. at 163, 113 S.Ct. 692. There, the Court agreed that occupational hearing loss, despite its latency, did not qualify as an occupational disease that does not result in immediate disability. In 1984, Congress enacted amendments to the Act creating special provisions for occupational diseases, but only for such diseases that did not immediately result in disability or death. *See* 33 U.S.C. §§ 902(10), 908(c)(23), 910(d)(2), 910(i). As the court of appeals explained, and the Supreme Court agreed, this "third system" of compensation under the Act applied only to job-related injuries or diseases that did not become apparent until after retirement. *See Bath Iron Works,* 942 F.2d at 813. In fact, reports showed that Congress primarily was concerned with "long-latency" occupational diseases in amending the LHWCA. *See, e.g.,* H.R.Rep. No. 98–570, at 10 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin. News 2734, 2743 (describing the amendments as insuring that long-latency occupational disease claimants do not continue to face procedural hurdles). Thus, even if Ronne's back condition could be called an occupational disease, we disagree with the Director that the Act's third compensation system applies here because of our earlier holding: Ronne's injury did immediately result in disability and was apparent before retirement. His back problem is not the long-latency condition with which Congress was concerned in the 1984 amendments.

■ Congress' recognition that occupational disease or infection may result from accidental injury does not mean that these types of injuries are conflated. If anything, it seems more likely that what Congress had in mind in singling out this category was to include latent infections which result from traumatic injuries as

"injuries" under the Act. The language describing "occupational disease or infection" as arising from accidental injury was part of the original statute. Congress specifically used this language because it was included in the "best" state compensation laws at the time, particularly New York's law. *See* 68 Cong. Rec. 5412 (1927). The New York statute specified the diseases which qualified as "occupational diseases" entitling the claimant to compensation. *See* N.Y. Work. Comp. § 3(2) (McKinney 1999) (listing poisonings; dust diseases; respiratory, gastro-intestinal, nerve, eye, and skin disorders within certain hazardous employments and within particular activities). Back problems arising from a traumatic injury clearly were not intended as occupational diseases under this scheme.

In any event, an occupational disease still must be particular to the employee's work conditions, as even the *Gardner* court acknowledged. Walking, which led to Ronne's back symptoms, certainly was not an activity particular to his employment. It is this issue which the Director's view of occupational disease ignores. If Congress believed that every medical problem that resulted from an isolated traumatic injury was an occupational disease, it would have had no reason to distinguish accidental injuries and occupational diseases under the Act. Congress merely could have had the definition of injury turn on whether the disability was latent or non-latent. Instead, the compensation structure of the Act depends upon the type of injury the claimant suffered, and thus the Director somehow must set the parameters of what constitutes an occupational disease, which it does not do here. We do not find the Director's position reasonable.

## III. CONCLUSION

Substantial evidence supports the ALJ's finding of fact that Ronne's back condition naturally progressed from his earlier knee injury, the combination of which made him totally and permanently disabled. Since Ronne could not return to longshore work from the time of his partially disabling knee injury, and earned no wages after that date, the time of injury for purposes of all compensation is the time he suffered the knee injury. That is the date of Ronne's disability.

AFFIRMED.