**Arthur DEWEERT, Petitioner,**

v.

**STEVEDORING SERVICES OF AMERICA; Homeport Insurance Co.; Director, Office of Workers' Compensation Programs, Respondents.**

**No. 00–71273.**

United States Court of Appeals, Ninth Circuit.

Nov. 29, 2001.

Submitted Sept. 13, 2001*

Filed Nov. 29, 2001

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 14, 2002.

R.App. P. 34(a)(2).

Charles Robinowitz, Portland, Oregon, for the petitioner.

John Dudrey, Williams Fredrickson, LLC, Portland, Oregon, for the respondents.

Before: THOMPSON, TASHIMA, and GRABER, Circuit Judges.

GRABER, Circuit Judge:

Petitioner, Arthur DeWeert, filed a claim for benefits pursuant to the Longshore and Harbor Workers' Compensation Act (Act), 33 U.S.C. §§ 901–950. An administrative law judge (ALJ) found that Petitioner's post-injury wage-earning capacity exceeded his pre-injury average weekly wage and, accordingly, awarded him the nominal sum of $1 per week. The Benefits Review Board (Board) upheld that award. We affirm.

## STANDARD OF REVIEW

The Board "may not substitute its views for those of the ALJ, but instead must accept the ALJ's findings unless they are contrary to the law, irrational, or unsupported by substantial evidence." *King v. Dir., OWCP*, 904 F.2d 17, 18 (9th Cir.1990) (citation and internal quotation marks omitted). We review the Board's decision for "errors of law and adherence to the substantial evidence standard, and we may affirm on any basis contained in the record." *Alcala v. Dir., OWCP*, 141 F.3d 942, 944 (9th Cir.1998) (citation and internal quotation marks omitted).

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner is a registered longshoreman. He injured his lower back while at work on October 31, 1993. Although in pain, he returned to work the following day. A few

days later he made an appointment to see his family physician, Dr. McRae. On November 9, Dr. McRae diagnosed Petitioner as having a "muscular ligamentous strain" and cleared him for continued work. Petitioner returned to the doctor on November 16, complaining that he was still in pain. Dr. McRae recommended physical therapy and told Petitioner to take a week off from work. Following this week of rest, however, Petitioner was unable to return to his job as a longshoreman.

Upon examination of Petitioner's test results, Dr. McRae noted a "slightly abnormal" MRI and referred Petitioner to Dr. Delashaw, a neurosurgeon. Dr. Delashaw examined Petitioner on December 20, 1993, prescribed various medications, and recommended one week of bed rest. At a follow-up visit on January 3, 1994, Dr. Delashaw noted marked improvement but ordered a test to investigate the cause of Petitioner's continued pain. The procedure revealed "mild to moderate annular bulge" and moderate degenerative disc disease. Dr. Delashaw referred Petitioner to another neurosurgeon, Dr. Frank, to evaluate the need for surgery. Dr. Frank determined that surgery was unnecessary and, on February 14, Dr. Delashaw opined that Petitioner would "very likely" be able to return to work with continued physical therapy. Petitioner did so on April 4, 1994.

While lifting plywood at work on April 23, 1994, Petitioner re-injured his back. On April 29, this injury caused him to cease working for a second time. Dr. Delashaw performed additional tests but remained unable to explain Petitioner's complaints of back and leg pain. After some rest and additional physical therapy, Petitioner returned to work on July 6, 1994.

For nearly three years, Petitioner was able to manage sporadic flare-ups of back pain through occasional appointments with a chiropractor, Dr. Finkas. However, on

March 12, 1997, Petitioner visited Dr. Delashaw again, complaining of a somewhat more severe recurrence of back pain. Dr. Delashaw determined that Petitioner had suffered no additional injury. Instead, he noted that Petitioner was moderately obese and recommended that he stay physically active and lose weight.

On April 8, 1998, Dr. Finkas wrote a report stating that Petitioner responded favorably to chiropractic treatment when he suffered flare-ups of back pain. However, he opined that Petitioner's back condition was exacerbated by "bending/lifting type work. It is my understanding that several of his jobs at work (linesman, lasher and raftsman) require this type of manual labor. [Petitioner] would not be suited for that type of work."

Petitioner's employer paid him *temporary* disability benefits for the two periods when he was not working: November 17, 1993, to April 3, 1994; and April 29, 1994, to July 5, 1994. The current dispute began when Petitioner applied for *permanent* partial disability benefits.

After a hearing, the ALJ held that Petitioner was entitled to $1 per week, because he had not experienced a loss of earning capacity. The Board affirmed, and Petitioner filed this timely petition for review.

## DISCUSSION

The Act authorizes compensation "not for physical injury as such, but for economic harm to the injured worker from decreased ability to earn wages." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 126, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997). Injured employees receive compensation for permanent partial disabilities based on a percentage of the difference between their pre-injury "average weekly wages" and their post-injury "wage-earning capacity." 33 U.S.C. § 908(c)(21); *see also*

*Sproull v. Dir., OWCP,* 86 F.3d 895, 898 (9th Cir.1996).

The ALJ found that Petitioner was not entitled to benefits because his post-injury wage-earning capacity exceeded his pre-injury average weekly wage. The ALJ awarded Petitioner $1 per week after finding that "there is a significant possibility that he may, in the future, experience a loss of wage earning capacity as a result of this injury" and that, if such a loss occurred, the award could then be modified upward. The Supreme Court has mandated de minimis awards in those circumstances. *Rambo,* 521 U.S. at 135–36, 117 S.Ct. 1953.

Petitioner argues that the ALJ incorrectly calculated both his average weekly wage and his wage-earning capacity and, therefore, that the Board erred in accepting the ALJ's award of $1 per week. For the following reasons, we are not persuaded by Petitioner's arguments.

## A. Average Weekly Wage

The Act provides that a claimant's pre-injury average weekly wage is to be determined by examining the 52 weeks immediately before "the time of the injury." 33 U.S.C. § 910. Although the Act defines "time of injury" for occupational diseases,[1] it does not do so for accidental injuries like the one sustained by Petitioner. *Port of Portland v. Dir., OWCP,* 192 F.3d 933, 937 (9th Cir.1999), *cert. denied,* 529 U.S. 1086, 120 S.Ct. 1718, 146 L.Ed.2d 640 (2000).

■ In this case, the ALJ determined that the "time of injury" was October 31, 1993, the day on which Petitioner hurt his back. Petitioner contends that, under *Johnson v. Director, OWCP,* 911 F.2d 247 (9th Cir.1990), the "time of injury" was November 16, 1993, the date on which he claims he became aware of his disability. Because of a quirk in Petitioner's vacation time, that 17–day difference would make his average weekly wage $40.43 higher.

In *Johnson,* the claimant's disability, "although due to a traumatic episode, was not evident" until more than three years later. *Johnson,* 911 F.2d at 249. The court observed that, " '[i]n most cases of traumatic injury, the time of injury will coincide almost exactly with the time the worker is disabled.' " *Id.* (quoting *Todd Shipyards Corp. v. Black,* 717 F.2d 1280, 1288 (9th Cir.1983)). However, in an "exceptional" case, " 'injury' under the statute means injury . . . as of the time when the disability attributable to the injury becomes manifest." *Id.*

Petitioner argues that his claim is governed by *Johnson* and that the ALJ erred when she found the time of injury to be the date of Petitioner's accident rather than the date when Petitioner ceased working. His argument is unpersuasive for two reasons.

First, in *Johnson,* at the time of the traumatic episode, the claimant's disabling injury was "latent and unknown." 911 F.2d at 249; *see also Port of Portland,* 192 F.3d at 937. The opposite is true of Petitioner's injury: The ALJ found that

> the facts of this case show that *[Petitioner] was aware of his injury the day it occurred, and was bothered enough by the effects that he made a doctor's appointment within the next few days* (although the appointment did not occur until two weeks later).... On these facts, I cannot conclude that the injury was "latent"....

(Emphasis added.) Those findings are supported by substantial evidence.

---

1. For occupational diseases, the "time of injury" is the date when the claimant became aware (or should have become aware) of the relationship among the employment, the disease, and the disability. 33 U.S.C. § 910(i).

Second, even if we were to accept Petitioner's claim that his disability first manifested itself fully on November 16, this is not the kind of "exceptional case" envisioned by the court in *Johnson,* where more than three years elapsed between the claimant's accident and the onset of disability. *See Johnson,* 911 F.2d at 249 (problems with the traditional rule may arise in "exceptional cases, like the one at bar, *where the onset of the disability occurs years after the initial trauma"* (emphasis added)). Instead, Petitioner stopped working only 17 days after his accident. *Johnson* is distinguishable for this reason as well. *Cf. Port of Portland,* 192 F.3d at 937 (distinguishing *Johnson* because *"Johnson* applied to a case where the disabling symptoms of an earlier accident did not appear *for years* after the accident" (emphasis added)).

Petitioner seems to be arguing for a bright-line rule that would make the "time of injury" the date when the claimant actually stopped working, but there is no support for such a rule either in the Act or in *Johnson.* Even in the context of occupational diseases, the relevant date is when the claimant is or *should be* aware of the disability. Here, the ALJ found that the claimant was *actually* aware of the disability on *the date of injury.*

For these reasons, we hold that *Johnson* does not assist Petitioner. The ALJ properly calculated his pre-injury average weekly wage.

B. Wage–Earning Capacity

The calculation of post-injury wage-earning capacity "shall be determined" by examining a claimant's actual earnings if they "fairly and reasonably represent his wage-earning capacity." 33 U.S.C. § 908(h). If the claimant's actual earnings do not "fairly and reasonably" represent his wage-earning capacity, the ALJ

> may, in the interest of justice, fix such wage-earning capacity as shall be rea-

sonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition. *Id.* We have interpreted § 908(h) to mean "that even higher post-injury earnings do not preclude compensation for the claimant if the claimant has, nevertheless, suffered a loss of wage-earning capacity." *Container Stevedoring Co. v. Dir., OWCP,* 935 F.2d 1544, 1549 (9th Cir.1991).

Here, the ALJ calculated Petitioner's wage-earning capacity by averaging his actual wages from the date of injury to the present, adjusting them downward to take into account contractual wage increases. The ALJ concluded that the resulting figure was higher than Petitioner's pre-injury average weekly wage and, thus, that Petitioner had not suffered a loss in wage-earning capacity.

Petitioner argues that the ALJ erred in refusing to adjust the figure further downward to take account of the following facts: (1) Petitioner's actual wages were higher than his wage-earning capacity because of an increase in "work opportunity" due to favorable economic conditions; (2) Petitioner can no longer work as a linesman; and (3) in 1995, Petitioner decided to work a night shift at an increased wage.

### 1. Petitioner's "Work Opportunity" Argument

■ Petitioner argues that whenever an ALJ assesses a claimant's post-injury wage-earning capacity, the ALJ *must* take into account any increase or decrease in "work opportunity" attributable to the typical ups and downs of the national economy. In support, Petitioner cites *Devillier v. National Steel & Shipbuilding Co.,* 10 Ben. Rev. Bd. Serv. (MB) 649 (1979), in which the Benefits Review Board listed a number of variables that an ALJ should consider when determining wage-earning

capacity.[2] The Board noted:

> Regarding general economic conditions, it may be unjust in times of economic slump to grant a substantial award to an unemployed—but not unemployable—worker with a slight disability. On the other hand, it may be unfair to allow no award to a clearly physically-disabled worker who is working only because the economy is booming.

*Id.* at 656 (citation omitted).

*Devillier* makes it clear that an ALJ may take economic conditions into account when determining a claimant's residual wage-earning capacity. However, it is not readily apparent that *Devillier requires* that this calculation be performed in every case. In fact, the Board limited the reach of its holding with respect to at least some of the listed factors: "We are not holding that every listed variable must be considered...." *Id.* at 661. It is unclear whether, under *Devillier*, an ALJ *always* must consider macro-economic forces before arriving at a determination of residual wage-earning capacity.

Fortunately, we need not resolve that interesting question here, because the ALJ cited and applied *Devillier.* She considered Petitioner's work-opportunity argument and rejected it on the merits.

In factual findings supported by substantial evidence, the ALJ concluded that Petitioner worked extra hours primarily because of an increase in his "marketable skills" and "seniority."[3] Thus, she implicitly found that the booming economy was *not* the primary reason for Petitioner's increase in work opportunity. Those findings are supported by substantial evidence and demonstrate no legal error.

### 2. Petitioner's Capacity to Work as a Linesman

Even if some portion of Petitioner's work opportunity *could* be attributed to unusually prosperous economic conditions, that factor would not aid Petitioner. On the contrary, because he continues to possess the capacity to work as a linesman, any work hours Petitioner might lose as a result of some future economic decline could be replaced with work hours gained through shifts as a linesman.

Petitioner claims that he is no longer physically capable of performing the duties required of a linesman. However, two aspects of the record provide substantial support for the ALJ's finding that Petitioner could return to this type of work.

First, the weight of the medical evidence demonstrates that Petitioner could per-

**2.** Although *Devillier* is not binding on us, we typically respect Board interpretations of the Act " 'where that interpretation is reasonable and reflects the policy underlying the statute.' " *Long v. Dir., OWCP*, 767 F.2d 1578, 1580 (9th Cir.1985) (quoting *Nat'l Steel & Shipbldg. Co. v. United States Dep't of Labor*, 606 F.2d 875, 880 (9th Cir.1979)); *see also Alcala v. Dir., OWCP*, 141 F.3d 942, 944 (9th Cir.1998).

Petitioner asserts that *McCormick S.S. Co. v. United States Employees' Compensation Commission*, 64 F.2d 84 (9th Cir.1933), is inconsistent with *Devillier*. We have two responses. First, the Benefits Review Board was not bound to follow that case in interpreting the Act. Second, the two decisions are consistent. *McCormick* held only that the Act's pro-

vision allowing modification of an order due to a "change in conditions" referred to a change in the individual's wage-earning capacity, not to a change in external economic conditions. *Id.* at 85. *Devillier* is likewise focused on accurately determining wage-earning capacity.

**3.** After his injury, Petitioner began taking on more skilled jobs, such as hatch tender, winch driver, and crane operator. These jobs are less physically demanding and pay more than the jobs that Petitioner performed before his injury. In addition, skilled workers such as Petitioner are dispatched first each day. They also are entitled to Pay Guaranty Plan wage payments when they are available for work, but no skilled work is available for them to perform.

form the duties necessary for employment as a linesman. It is true that Dr. Finkas concluded otherwise, but he is a chiropractor rather than a medical doctor, and his opinion derives no support from the records and opinions of either of Petitioner's treating medical doctors (Drs. McRae and Delashaw). The chiropractor's opinion is further called into question by the ALJ's observation that Dr. Finkas did not appear to understand fully the physical demands of linesman jobs.

Second, evidence concerning Petitioner's post-injury employment and recreational activities also supports the finding that he can perform the duties required of a linesman. Petitioner continued to work as a linesman after his injury and continued to apply for linesman jobs even after his chiropractor recommended that he not do so. In addition, Petitioner continued to hunt and dress elk and deer after his injury. These activities involve significant bending and pulling, the very activities that Petitioner claims he is unable to perform as a linesman.

Accordingly, the ALJ's determination that Petitioner is employable as a linesman is supported by substantial evidence.

3. Petitioner's Time on the Night Shift

█ The ALJ concluded that Petitioner's time as a night-shift hatch tender "fairly and reasonably" represents his wage-earning capacity. We agree.

Petitioner admits that he worked on the night shift at a grain elevator for eight months in 1995, but he argues that, because night-shift workers are paid at a higher rate, his actual average presents a distorted picture of his earning *capacity*. Petitioner notes that, in 1995, he and his wife had separated; he says that he chose to work nights during that time to "stay out of trouble." Because he had chosen not to work nights before he was injured, Petitioner argues, it is unfair to include the night-shift wages as part of his wage-earning capacity unless his pre-injury average weekly wage is increased to offset them.

█ Petitioner cites nothing in support of the proposition that an increase in wages after a *voluntary* change of jobs must be ignored in order to calculate wage-earning capacity. Logic suggests the opposite. The objective in determining wage-earning capacity "is to determine the wage that would have been paid in the open market under normal employment conditions to the claimant as injured." *Long v. Dir., OWCP*, 767 F.2d 1578, 1582 (9th Cir.1985). It is true that "longer hours ... may make post-injury earnings an unreliable indicator of wage-earning capacity." *Id.* However, "if the post-injury work is continuous and stable, the post-injury earnings are more likely to reasonably and fairly represent a claimant's wage-earning capacity." *Id.*

Here, the ALJ averaged three years and ten months of actual earnings to compute Petitioner's wage-earning capacity. She committed no legal error in refusing to factor out an eight-month period when Petitioner, of his own volition, and unrelated to his injury, decided to work a night shift. As noted by the ALJ, Petitioner "was clearly capable of doing this type of work, and chose to continue with this work in spite of" his back pain. "Further, this was a work option that was readily available to him in the labor market, as he chose to start and stop working there for reasons having nothing to do with his injury or a need to earn more money to make up for other work opportunities."

As both the ALJ and the Board explained, each of Petitioner's three arguments with respect to wage-earning capacity is unpersuasive. We therefore affirm the determination that Petitioner's wage-earning capacity exceeds his average weekly wage.

The petition for review is DENIED.