171 P.3d 1058 (2006)
134 Wash.App. 739
Donald HARRY, Appellant,
v.
BUSE TIMBER & SALES, INC., and the Department of Labor & Industries, Respondents.
No. 55902-8-I.
Court of Appeals of Washington, Division 1.
May 1, 2006.
As Amended on Reconsideration in Part October 5, 2006.
Nicole Alys Hanousek, Law Office of William D. Hochberg, Edmonds, for Appellant.
Amy L. Arvidson, Keehn Arvidson, PLLC, Seattle, for Respondent Buse Timber & Sales, Inc.
Nancy Elizabeth Hovis and Anastasia R. Sandstrom, Attorney General's Office, Seattle, for Respondent Department of Labor & Industries.
BAKER, J.
¶ 1 Noise-related hearing loss is not a progressive disease, yet it has been referred to as "progressive" in workers' compensation case law.[1] And it is considered to be "partially disabling" long before the worker is perceptibly impaired. These two facts have led to the strange outcome below in this case: a worker is paid for his lost hearing based on a 1974 schedule of benefits for damage to his hearing that occurred long after 1974. His self-insured employer knew of, but did not disclose his hearing loss for almost 30 years, and as a result has succeeded in paying for the disability at the comparatively low rate in effect in 1974.
¶ 2 Donald Harry was exposed to loud noise as part of his job at Buse Timber & Sales. Beginning in the mid-1960s, Buse regularly tested him for hearing loss with industrial audiograms. Harry was told each time that his hearing "looked about the same," and as often happens with slow, incremental hearing loss, he did not notice it until late in the 1990s. In 2001, after his retirement, Harry finally saw a doctor, who told him he had substantial hearing loss in both ears. Most of the loss was noise-induced, the result of prolonged exposure to noise at Buse. Harry applied for permanent partial disability benefits for his hearing loss.
¶ 3 The Department of Labor and Industries ordered a payment based on the 2001 schedule of benefits. Buse protested, arguing that its industrial audiograms for Harry showed that he had been partially disabled since 1974, and that the 1974 schedule of benefits should apply. The Department agreed, issued a revised award using the 1974 schedule, and closed Harry's case. *1059 Harry appealed, arguing that the industrial audiograms were not valid to establish his disability, or in the alternative, that he should receive a tiered award based on the schedule in effect at the time of each documented hearing loss. The Board of Industrial Insurance Appeals and the superior court affirmed the Department's decision on the grounds that the audiograms were sufficient to establish the existence of compensable, partial hearing loss. Based on existing case law, both the Board and the superior court determined that the 1974 schedule of benefits applied to Harry's claim. Harry appeals solely on the issue of whether he is entitled to a tiered award.
¶ 4 We reverse because a tiered schedule of benefits is the only way to treat workers with noise-related hearing loss the same as workers with other occupational diseases and injuries as required by the Industrial Insurance Act.
¶ 5 Harry worked for Buse for 33 years, from 1968 until 2001. During that time, he was routinely exposed to loud noise. In the mid-1960s, Buse began administering yearly industrial audiograms to its employees. Harry's first audiogram, taken in 1974, showed a compensable hearing loss in the left ear. Subsequent audiograms revealed additional damage, and by 1986, his right ear showed significant hearing loss also. Although Harry received copies of the audiogram results, they were technical and never were explained to him. He was told after each test that his hearing looked "about the same;" he was not told to consult a doctor, and he was not provided with hearing protection until 1985. In the late 1990s, a Buse supervisor advised Harry to see a doctor about his hearing. Harry began to notice hearing problems about then, and finally consulted a doctor in 2001 after his retirement. The doctor told him that he had a 41.25 percent hearing loss in the left ear and 38.1 percent loss in the right, equal to 38.13 percent hearing loss for both ears.
¶ 6 Harry filed a claim with the Department of Labor and Industries for permanent partial disability in 2001. His claim was accepted by the Department and Buse, a self-insured employer, was ordered to pay Harry according to the 2001 schedule of benefits for hearing loss compensation. That schedule set the award for complete hearing loss in both ears[2] at $67,33.64. Because Harry's loss was 38.13 percent, his total award was $25,673.19. Buse protested, arguing that 1974 was the date Harry's disease first became "partially disabling"[3] and that the 1974 schedule should apply. Indeed, an industrial audiogram from 1974 showed that Harry had a 5.6 percent hearing loss in his left ear  enough to be "partially disabling" according to the American Medical Association, but small compared to the almost 40 percent binaural hearing loss Harry ultimately suffered. Nevertheless, the Department revised its award for Harry's entire claim based on the 1974 schedule of benefits. In 1974, the award for complete hearing loss in both ears was $14,400. Harry's revised award was $5,490.72.
¶ 7 Harry appealed to the Board of Industrial Insurance Appeals, arguing that either (1) the Buse audiograms were not a valid basis to establish hearing loss disability, or (2) if valid, each additional compensable hearing loss shown by the audiograms constituted a separate disease, and should be compensated according to the schedule in effect on the date of each such audiogram. Harry was unsuccessful at the Department, Board, and superior court levels. He now appeals, conceding the validity of the audiograms, but arguing adoption of his tiered award theory.
¶ 8 Washington enacted the Industrial Insurance Act[4] (IIA), also known as "workers' compensation," to provide predictable relief to employees harmed on the job. The IIA should be construed liberally, and doubts resolved in favor of the injured worker.[5] *1060 A permanent partial disability is an injury or occupational disease that causes the loss, or loss of use, of a particular body part.[6] Permanent partial disability results from an injury or an occupational disease. "Injury" is defined as "a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result,"[7] for example, amputation of a finger.[8] An occupational disease is "such disease or infection as arises naturally and proximately out of employment,"[9] for example, asbestosis.[10]
¶ 9 Noise-related hearing loss is categorized as an occupational disease.[11] The damage normally worsens incrementally over time. Like other occupational diseases, it is difficult to pinpoint a precise date of injury for noise-related hearing loss.[12] Nevertheless, the disease has many characteristics of an injury.[13] It occurs simultaneous to noise exposure,[14] and does not progress after the noise ends. It differs from other industrial diseases such as asbestosis, which can manifest itself years after the worker is no longer exposed to asbestos fibers, and progress to severe disability or death.[15] Also, each instance of hearing loss is separate and distinct from prior losses; each would occur regardless of any previous hearing damage.[16] Noise-induced hearing loss thus has indicia both of industrial diseases and injuries, and in this way it is unique.[17]
¶ 10 Classification of an industrial condition as an injury or a disease is more than academic; it can affect how much money the worker receives. Compensation for permanent partial disability is in a fixed dollar amount based on a schedule that assigns value to the particular body part or function lost.[18] Because the schedule of benefits has increased over time,[19] the Department must fix a date to determine which schedule applies. The rule of law for choosing this date is different depending upon whether the condition is a disease or an injury. For an injury, the applicable schedule is the one that was in effect on the date when the injury occurred.[20] For an occupational disease, the correct schedule is the one in effect on "the date the disease requires medical treatment or becomes totally or partially disabling, whichever occurs first."[21] This is also called the "date of manifestation."[22] Because hearing loss is categorized as a disease, *1061 and because the date of medical treatment is easy to ascertain, hearing loss cases focus on the term "partially disabling."
¶ 11 Medically, hearing loss becomes "partially disabling" "when the average loss exceeds 25 decibels across the frequencies specified in the American Medical Association Guides."[23] This translate to a relatively small percentage of overall hearing loss. According to the AMA guidelines therefore, a worker can be "partially disabled," although he would not be disabled according to the common legal understanding of that term.[24] In contrast, an industrial disease such as asbestosis becomes "partially disabling" when the worker actually experiences symptoms and falls ill, even though he may have had asbestos fibers in his lungs or even internal scarring long before that.[25]
¶ 12 There is another problem with classifying noise-induced hearing loss as a disease: RCW 51.31.180(b) assumes that only one disease exists for each claim filed. Each increase in noise-induced hearing loss, however, is separate and independent of prior losses.[26] There are thus many possible dates when such hearing loss "becomes partially disabling," and therefore many different diseases that might be covered by a single claim. For example, if a worker's audiogram revealed a 2.5 percent loss in 1990, he met the American Medical Association criteria for "partial disability" at that time. If testing revealed in 1995 that his hearing had declined another 5 percent due to continued occupational noise from 1990 to 1995, he suffered two noise-induced hearing losses, one which became partially disabling in 1990, and one in 1995. There is no question that he could have filed two separate claims for each loss.[27] But he is also allowed to file a single claim for the entire 7.5 percent hearing loss.[28] Our cases have not yet crafted a satisfactory answer to the issue of which schedule (or schedules) of benefits should apply in this situation.
¶ 13 Buse and the Department argue that (1) RCW 51.32.180(b) is unambiguous, (2) hearing loss is one progressive condition, and (3) the earliest documented hearing loss establishes the applicable schedule, because that is the date when the condition became "partially disabling."
¶ 14 Their position is not supportable in light of Pollard v. Weyerhaeuser Co.[29] In Pollard, a worker experienced noise-related hearing loss beginning in the 1970s. His claim was filed, paid and closed in 1982 when he was first diagnosed with a 10 percent hearing loss.[30] Between 1982 and 1999, Pollard experienced additional hearing loss documented in several audiograms conducted by Weyerhaeuser, his employer. In the 1990s, he noticed more hearing loss; he filed a new claim in 1999 when his loss had reached 45.9 *1062 percent.[31] The court rejected Weyerhaeuser's argument, the same argument Buse makes here, that the 1982 schedule should apply to the 1999 claim. It held that (1) RCW 51.32.180(b) is ambiguous with respect to noise-related hearing loss,[32] (2) different episodes of hearing loss are properly viewed as multiple diseases instead of a single progressive condition, and (3) the applicable schedule should be the schedule in effect in 1994, when Pollard "sought treatment" for his post-1982 hearing loss.[33] According to Pollard, then, Harry should be compensated using the 2001 schedule, because that is when he sought treatment for his single hearing loss "disease".
¶ 15 But Pollard did not address the "partially disabling" language in RCW 51.32.180(b). If there is a significant time lapse between the date a worker becomes disabled and the date he seeks medical treatment, the statute requires the Department to fix benefits according to the earlier date. Yet the Pollard court applied the schedule of benefits in effect when Pollard first sought medical treatment for the post-1982 hearing loss, even though intervening audiograms established that some of Pollard's post-1982 hearing loss occurred earlier than 1994 and some occurred after 1994.[34]
¶ 16 We decline to strictly apply Pollard. To do so would conflict with RCW 51.32.180(b), because Harry did experience some partially disabling hearing loss in 1974, long before he first sought medical treatment for that condition. Use of the 2001 schedule would provide a windfall for Harry, because some of his hearing damage occurred long ago when benefits were lower. On the other hand, to apply the 1974 schedule ignores the fact that Harry suffered most of his hearing loss after that year, resulting in a windfall for his employer.
¶ 17 Harry proposes a solution to the problem: a tiered award by which each compensable hearing loss is treated as partially disabling on the date it is documented by audiogram as verified by medical testimony. Workers would then be paid for that percentage of hearing loss according to the schedule in effect on the date of each such audiogram.
¶ 18 Buse and the Department argue that Harry's "novel" tiered award theory has been "expressly rejected" by the Board of Industrial Insurance Appeals. This is inaccurate: the proposal is neither novel nor dead. The concept of a tiered award in such cases was raised as early as 1998, and in that case the Board seemed intrigued by the concept, but felt that it was beyond its power to adopt:
The Department of Labor and Industries and the claimant argue that noise-induced hearing loss is not a single disease but is multiple diseases. Accordingly, a separate schedule of benefits should be used for each incremental increase in hearing loss to reflect the compensation in effect at the time the loss is experienced. While this concept has a certain logic, we are unable to find any support for it in either the Industrial Insurance Act or accompanying case law. It is an imaginative proposal that appears to be outside the province of the Board of Industrial Insurance Appeals.[[35]]
¶ 19 The existing system is highly inequitable, frequently to the worker and sometimes to the employer. It is not practical to require claims to be filed each time testing reveals a compensable hearing loss, particularly where, as here, the worker is unaware of that choice. With a tiered award system, the Department must simply do a little more math.
¶ 20 The Department next argues that a tiered award system would treat hearing loss differently from other types of occupational diseases, contrary to Supreme Court precedent. In Boeing Company v. Heidy,[36] the Board acknowledged that hearing loss is different *1063 from other types of "diseases" because the sufferer can be partially disabled and not know it.[37] The Department attempted to solve this problem by creating a requirement that, in the case of hearing loss, the worker must know he is disabled before the applicable schedule of benefits can be established.[38] Our Supreme Court rejected this rule because RCW 51.32.180(b) does not require knowledge, and "[a]part from the unique circumstances posed by hearing loss, as a general proposition the date a worker is partially disabled is usually the same date a worker knows of his or her disabling disease."[39]
¶ 21 But Heidy erroneously describes noise-induced hearing loss as a progressive disease, and does not address the underlying problem in this area of the law: unlike any other occupational disease, hearing loss can be partially disabling long before the disease actually has any noticeable deleterious effect on the worker, or has been diagnosed by a doctor. Strict application of RCW 51.32.180(b), as the Board correctly pointed out in Heidy, actually does treat workers with noise-induced hearing loss differently from workers with other occupational diseases or injuries.
¶ 22 A tiered award system is the most efficient way to treat similar claims similarly, but the Department contends that it is legally flawed because under Pollard, noise-related hearing loss can only constitute separate diseases if the worker files separate industrial insurance claims. It is true that in Pollard, the court treated the 1982-1999 hearing loss as one disease even though there were intervening audiograms showing a continuous decline in Pollard's hearing.[40] Also, the Board has since ruled that because a claim is "necessarily filed for a single disease process," then by definition a single hearing loss claim can only encompass one disease.[41]
¶ 23 We reject the "single claim, single disease" approach as illogical and inequitable. Medically speaking, whether a person has one or more diseases cannot possibly turn on whether one or more industrial insurance claims are filed. And the inequities of this system have been explained earlier in this opinion.
¶ 24 In contrast, a tiered award system solves the problems presented by this case. It prevents either the employer or the worker from receiving a windfall. It encourages employers to administer regular audiograms, disclose the results, provide hearing protection, and tell the worker to see a doctor before the condition worsens. At the same time, it does not require the worker to file a claim for each tiny, incremental loss in hearing, which would flood the Department with claims for negligible amounts of money.
¶ 25 Application of the 1974 schedule of benefits to Harry's entire hearing loss was improper. This case is remanded to the Department for additional fact finding to establish the proper dates of hearing loss to be paid according to a tiered schedule. The date of each audiogram which established a compensable amount of hearing loss, as verified by medical testimony, establishes the rate of benefits for the percentage of hearing loss that the audiogram documented.

Attorney Fees
¶ 26 Harry requests attorney fees under RCW 51.52.130. The Industrial Insurance Act grants attorney fees on appeal to a worker who obtains reversal or modification of a board order.[42] Because the Board's order was reversed and remanded, the request is granted.
¶ 27 REVERSED and REMANDED.
WE CONCUR: SCHINDLER, A.C.J., and COLEMAN, J.
NOTES
[1] See, e.g., Boeing Co. v. Heidy, 147 Wash.2d 78, 51 P.3d 793 (2002).
[2] This "average" percentage of hearing loss in both ears is referred to as "binaural" hearing loss.
[3] Under RCW 51.32.180(b), the applicable schedule is the one in effect when the disease first becomes partially disabling or when the worker seeks medical treatment, whichever comes first.
[4] Title 51 RCW.
[5] McIndoe v. Dep't of Labor & Indus., 144 Wash.2d 252, 256-57, 26 P.3d 903 (2001).
[6] RCW 51.08.150.
[7] RCW 51.08.100.
[8] RCW 51.32.080(1)(a).
[9] RCW 51.08.140.
[10] See, Kilpatrick v. Dep't. of Labor & Indus., 125 Wash.2d 222, 227, 883 P.2d 1370, 915 P.2d 519 (1994).
[11] Boeing Co. v. Heidy, 147 Wash.2d 78, 88, 51 P.3d 793 (2002); Pollard v. Weyerhaeuser, 123 Wash.App. 506, 508, 98 P.3d 545 (2004), rev. denied, 154 Wash.2d 1014, 113 P.3d 1040 (2005).
[12] The damage occurs gradually, as opposed to hearing loss resulting from sudden head injury. See Rector v. Dep't. of Labor & Indus., 61 Wash. App. 385, 810 P.2d 1363 (1991); In re Eugene W. Williams, 95 3780 (BIIA Dec. 1998).
[13] RCW 51.32.080(1)(a) includes hearing loss among other scheduled injuries such as amputation. The U.S. Supreme Court has also affirmed that noise-related hearing loss is a "scheduled injury" and not a disease in the context of the Longshore and Harbor Workers' Compensation Act, 33 USCA §§ 901-951. Bath Iron Works Corp. v. Director, Office of Workers' Comp. Prog., 506 U.S. 153, 166-67, 113 S.Ct. 692, 121 L.Ed.2d 619 (1993).
[14] Bath Iron, 506 U.S. at 165, 113 S.Ct. 692. By analogy, imagine a worker who bumps his head at work every day for 10 years, and gradually loses his hearing as a result. Although the daily head bump may cause an impairment over time rather than all at once, one would hardly call the worker's condition a "disease."
[15] Bath Iron, 506 U.S. at 164-65, 113 S.Ct. 692.
[16] Pollard, 123 Wash.App. at 512, 98 P.3d 545.
[17] Heidy, 147 Wash.2d at 89, 51 P.3d 793.
[18] RCW 51.32.080. For example, a worker who loses his foot currently receives $66,596.60.
[19] RCW 51.32.080(b)(ii).
[20] Kilpatrick, 125 Wash.2d at 231, 883 P.2d 1370.
[21] RCW 51.32.180(b). "Partially disabled" is not defined in ch. 51.08 RCW.
[22] WAC 296-14-350(3).
[23] Heidy, 147 Wash.2d at 83, 51 P.3d 793.
[24] In the context of hearing loss claims, the definition of "partially disabling" is different from the common legal definition of that term. Black's Law Dictionary defines "partial disability" as "[a] worker's inability to perform all the duties that he or she could do before an accident or illness, even though the worker can still engage in some gainful activity on the job." Black's Law Dictionary, 494 (8th ed. 1999). But a 25 decibel hearing loss would not be noticed by most workers, let alone hinder them in their jobs. The Board tried to remedy this problem by requiring that the worker be aware of his hearing loss. Heidy, 147 Wash.2d at 88, 51 P.3d 793. The Supreme Court properly rejected this attempt to amend the statute by administrative rule. Heidy, 147 Wash.2d at 89, 51 P.3d 793. However, we note that according to the legal definition of "partially disabling," as it applies to other worker's compensation claims, no worker could be unaware of his disability, because it would need to be noticed enough to interfere with his work.
[25] Bath Iron, 506 U.S. at 165, 113 S.Ct. 692.
[26] Pollard, 123 Wash.App. at 512, 98 P.3d 545.
[27] See, Pollard, 123 Wash.App. at 512, 98 P.3d 545.
[28] No Washington court has held that such a claim is time barred, even if it is filed long after the damage took place. Also, in 2004 the Legislature set the time limit for filing occupational hearing loss claims at two years from the date of the last injurious exposure. RCW 51.28.055(2)(a).
[29] 123 Wash.App. 506, 98 P.3d 545 (2004), rev. denied, 154 Wash.2d 1014, 113 P.3d 1040 (2005).
[30] Pollard, 123 Wash.App. at 508, 98 P.3d 545.
[31] Pollard, 123 Wash.App. at 509, 98 P.3d 545.
[32] Pollard, 123 Wash.App. at 513, 98 P.3d 545.
[33] Pollard, 123 Wash.App. at 514, 98 P.3d 545.
[34] Pollard, 123 Wash.App. at 512, 98 P.3d 545.
[35] In re Eugene W. Williams, 95 3780, at 8 (BIIA Dec. 1988).
[36] 147 Wash.2d 78, 51 P.3d 793 (2002).
[37] Heidy, 147 Wash.2d at 83, 51 P.3d 793.
[38] Heidy, 147 Wash.2d at 88, 51 P.3d 793.
[39] Heidy, 147 Wash.2d at 89, 51 P.3d 793.
[40] Pollard, 123 Wash.App. at 512, 98 P.3d 545.
[41] In re Gerald J. Woodard, 03 22924, at 6 (BIIA Dec. 2004).
[42] RCW 51.52.130.