201 P.3d 1011 (2009)
Donald HARRY, Respondent,
v.
BUSE TIMBER & SALES, INC., and the Department of Labor and Industries, Petitioners.
No. 79613-1.
Supreme Court of Washington, En Banc.
Argued January 22, 2008.
Decided February 26, 2009.
As Corrected March 10, 2009.
Anastasia R. Sandstrom, Attorney General's Office, Kathryn Kunkler, Keehn Kunkler PLLC, Seattle, WA, for Petitioners.
William D. Hochberg, Nicole Alys Hanousek, Amie Christine Peters, Law Office of William D. Hochberg, Edmonds, WA, for Respondent.
Terri Lynn Herring-Puz, Attorney at Law, Tacoma, WA, Amicus Curiae on behalf of Aerospace Machinists District Lodge 751, Teamsters Joint Council # 28, Washington State Building & Constructions Trade Council, and Washington State Labor Council.
Gilbert M. Stratton, Bernadette Marie Pratt, Marne J Horstman, Craig Jessup & Stratton PLLC, Tacoma, WA, Amicus Curiae on behalf of Washington Self-Insurers Association.
MADSEN, J.
¶ 1 This case requires us to determine when occupational hearing loss becomes "partially disabling" for the purpose of determining the appropriate rate of compensation for a permanent partial disability award. Petitioners Buse Timber and Sales, Inc. (Buse) and Department of Labor and Industries (Department) contend Donald Harry's 2001 claim for 38.13 percent binaural hearing loss is compensable according to the benefit *1012 levels in effect in 1974, when he experienced a 5.6 percent unilateral hearing loss. The Court of Appeals disagreed, holding that Harry's occupational hearing loss became "partially disabling" on multiple dates, entitling him to compensation according to the schedule of benefits in effect on the date of each documented incremental loss.
¶ 2 We conclude that the Department erred in calculating Harry's permanent partial disability award according to the 1974 schedule of benefits. RCW 51.32.180(b) is ambiguous as to whether "the date ... the disease ... [i]s totally or partially disabling" refers to the first date any compensable hearing loss first occurred, or the last date hazardous workplace noise contributed to the disability for which a worker seeks compensation. Applying the liberal construal mandate, we hold occupational hearing loss is "partially disabling" within the meaning of RCW 51.32.180(b) as of the date a worker was last exposed to hazardous occupational noise.

FACTS
¶ 3 Donald Harry worked for Buse from 1968 until his retirement in 2001. He was exposed to loud noise throughout his employment. Buse administered annual audiograms in compliance with a Washington Industrial Safety and Health Act of 1973 (chapter 49.17 RCW) regulation. An audiogram performed in 1974 showed that Harry suffered a compensable hearing loss in his left ear. Successive audiograms document a gradual worsening of Harry's condition. By 1986, Harry's hearing loss had progressed to both ears. However, it was not until his retirement, in 2001, that he consulted a doctor. His doctor informed him he had a binaural (both ears) hearing loss of 38.13 percent.
¶ 4 Harry filed a permanent partial disability claim for occupational hearing loss. The Department accepted the claim and ordered Buse to compensate Harry for 38.13 percent binaural hearing loss, according to the schedule of benefits in effect in 2001. Buse protested the order. It argued Harry's permanent partial disability award should be calculated according to the 1974 schedule of benefits, when he first experienced a compensable hearing loss in his left ear. The Department agreed and revised its order based on the schedule of benefits in effect in 1974.
¶ 5 The Board of Industrial Insurance Appeals (BIIA) and the superior court affirmed the Department's order. The Court of Appeals reversed. Harry v. Buse Timber & Sales, Inc., 134 Wash.App. 739, 171 P.3d 1058 (2006). It reasoned that occupational hearing loss is appropriately analyzed as multiple diseases rather than a single disease, with compensation determined according to the schedule of benefits in effect at the time of each documented incremental loss. Id. at 746, 171 P.3d 1058.
¶ 6 Buse and the Department both filed petitions for review, which we granted. Harry v. Buse Timber & Sales, Inc., 161 Wash.2d 1014, 171 P.3d 1057 (2007).

ANALYSIS
¶ 7 The Industrial Insurance Act (IIA), Title 51 RCW, was designed to provide "sure and certain relief" to injured workers while limiting employer liability for industrial injuries. RCW 51.04.010; Dennis v. Dep't of Labor & Indus., 109 Wash.2d 467, 470, 745 P.2d 1295 (1987). Any doubts and ambiguities in the language of the IIA must be resolved in favor of the injured worker in order to minimize "the suffering and economic loss" that may result from work-related injuries. RCW 51.12.010; McIndoe v. Dep't of Labor & Indus., 144 Wash.2d 252, 256, 26 P.3d 903 (2001); Cockle v. Dep't of Labor & Indus., 142 Wash.2d 801, 811, 16 P.3d 583 (2001) ("[W]here reasonable minds can differ over what Title 51 RCW provisions mean..., the benefit of the doubt belongs to the injured worker.").
¶ 8 Occupational hearing loss is compensable as a permanent partial disability according to a fixed schedule of benefits. RCW 51.32.080(1)(a). Unlike the other disability classifications, a "permanent partial disability" is defined as a loss of bodily function rather than inability to perform one's job *1013 functions.[1]Clauson v. Dep't of Labor & Indus., 130 Wash.2d 580, 585, 925 P.2d 624 (1996); RCW 51.08.150. Cf. RCW 51.08.160 ("permanent total disability" prevents a worker from performing any work); RCW 51.32.090 (same for "temporary total disability"); RCW 51.32.090(4)(a) ("temporary total disability" interferes with a worker's normal job functions). A claimant is entitled to an award based on the percentage of functional loss of the affected body part, applying the schedule of benefits in effect on the date of injury. See RCW 51.32.080(2), (7). Thus, the amount of the award depends on two factors: the extent of the disability and the date the injury occurred.
¶ 9 It is undisputed Harry is entitled to a permanent partial disability award for 38.13 percent binaural hearing loss, resulting from continuous exposure to workplace noise from 1968 until his retirement in 2001. The only disputed issue is whether his occupational hearing loss is compensable according to the schedule of benefits in effect on the first date occupational noise resulted in a ratable loss of hearing or on the last date it contributed to his compensable disability.
¶ 10 Occupational hearing loss may result from either an industrial accident or continuous exposure to hazardous levels of noise. Noise-induced hearing loss is classified as an occupational disease.[2]Boeing Co. v. Heidy, 147 Wash.2d 78, 51 P.3d 793 (2002); Weyerhaeuser Co. v. Tri, 117 Wash.2d 128, 130, 814 P.2d 629 (1991); Pollard v. Weyerhaeuser Co., 123 Wash.App. 506, 512, 98 P.3d 545 (2004); In re Brooks, No. 02 17331 (Wash. BIIA Aug. 1, 2003); cf. Rector v. Dep't of Labor & Indus., 61 Wash.App. 385, 810 P.2d 1363 (1991) (hearing loss resulting from head injury compensable as industrial injury). This is because noise-induced hearing loss results from cumulative trauma rather than a single traumatic event and thus lacks the time-definiteness of an industrial injury.
¶ 11 Accordingly, RCW 51.32.180(b) controls the applicable schedule of benefits. RCW 51.32.180(b) was enacted in 1988 as an amendment to RCW 51.32.180 to address the applicable date for determining the appropriate rate of compensation for occupational diseases. Laws of 1988, ch. 161, § 5. RCW 51.32.180 provides:

*1014 Every worker who suffers disability from an occupational disease in the course of employment ... shall receive the same compensation benefits ... as would be paid and provided for a worker injured or killed in employment under this title, except as follows ... (b) ... the rate of compensation for occupational diseases shall be established as of the date the disease requires medical treatment or becomes totally or partially disabling, whichever occurs first, and without regard to the date of the contraction of the disease or the date of filing the claim.
(Emphasis added.)
¶ 12 Petitioners argue the statutory language, "the date the disease ... becomes totally or partially disabling," plainly means the date any compensable hearing loss first occurs, even if most of the claimant's compensable disability resulted from subsequent exposure to hazardous workplace noise. Accordingly, petitioners claim that Harry's 38.13 percent binaural hearing loss is compensable according to the schedule of benefits in effect in 1974, when an industrial audiogram revealed the existence of a 5.6 percent unilateral hearing loss.
¶ 13 The petitioners' interpretation of the statute is untenable. An "`[o]ccupational disease'" is "such disease or infection as arises naturally and proximately out of employment." RCW 51.08.140. Although we have described hearing loss as a "progressive condition," see Heidy, 147 Wash.2d at 88, 51 P.3d 793, hearing loss is not progressive in the sense that pneumonia or asbestosis is progressive. Id. Occupational hearing loss occurs simultaneously with exposure to injurious noise and does not progress after the exposure ends. Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs, 506 U.S. 153, 162, 113 S.Ct. 692, 121 L.Ed.2d 619 (1993). The injury is complete when the worker is removed from a noisy environment. Id.; Pollard v. Weyerhaeuser, 123 Wash. App. 506, 512, 98 P.3d 545 (2004). Prior hearing loss contributes to successive hearing loss only in the sense the resulting disability is cumulative.
¶ 14 Thus, if "partially disabling" refers to the first compensable hearing loss a worker experiences, as petitioners contend, any hearing loss that arises subsequently could not constitute the same "disease" referred to in RCW 51.32.180(b). This is because increased hearing loss cannot occur before a worker's subsequent exposure to injurious occupational noise. And it follows that an occupational disease cannot become "partially disabling" within the meaning of RCW 51.32.180(b) before the occurrence of the workplace conditions that caused the compensable loss at issue.[3]
¶ 15 If the phrase "the date the disease... becomes totally or partially disabling" refers to the date a compensable loss first occurs, we would, like the Court of Appeals, agree with Harry that RCW 51.32.180(b) requires the Department to apply multiple schedules of benefits to even a single claim for occupational hearing loss, as though it were multiple diseases. However, such an interpretation would unduly complicate the adjudication of occupational hearing loss claims. We believe the legislature intended a single claim for a permanent partial disability to be compensable according to a single schedule of benefits. Indeed, RCW 51.32.180(b) directs the Department to calculate benefits according to a single date, not multiple ones, presumably to further the goal of reducing litigation and providing "swift and certain" relief to injured workers.
¶ 16 Considering the purpose of the IIA, the liberal construal mandate, the definition of occupational disease, and the nature of occupational hearing loss, we interpret "the date the disease ... becomes totally or partially disabling," RCW 51.32.180(b), as referring to the date the aggregate compensable disability occurred, not the date a compensable loss first occurred. Accordingly, we hold *1015 the date of last injurious exposure is the date occupational hearing loss is "partially disabling" within the meaning of RCW 51.32.180(b).
¶ 17 Harry declined to advance this reading of the statute because he assumed it was foreclosed by our decision. Dep't of Labor & Indus. v. Landon, 117 Wash.2d 122, 127, 814 P.2d 626 (1991); see Suppl. Br. of Resp't, Donald Harry at 7-8 n. 1("RCW 51.32.180... specifically prohibits the establishment of the rate of compensation as of the date of last exposure" (citing Landon, 117 Wash.2d at 127, 814 P.2d 626)).
¶ 18 In Landon, we explained that in adopting the 1988 amendment to RCW 51.32.180(b), the legislature rejected the last injurious exposure rule in favor of the date of manifestation rule as applied to long-latency diseases such as asbestosis and silicosis. Under the date of manifestation rule, the date the disease actually requires medical treatment or interferes with a worker's job performance, not the date of contraction, controls the schedule of benefits. See, e.g., Puckett v. Johns-Manville Corp., 169 Cal. App.3d 1010, 215 Cal.Rptr. 726 (1985); Zurich Gen. Accident & Liability Ins. Co. v. Indus. Comm'n, 203 Wis. 135, 233 N.W. 772 (1930) (disability occurred when worker was obliged to take a lower paying job as a result of silicosis).
¶ 19 Landon held the date of manifestation rule applies as well to claims filed before the effective date of the 1988 amendment: "[W]orkers' compensation benefits should be calculated as of the date the disease manifests itself, not the date the worker suffered the last injurious exposure to the harmful material." Landon, 117 Wash.2d at 128, 814 P.2d 626. Landon is factually distinguishable because it involves a long-latency disease, not a cumulative trauma disease.[4]
¶ 20 The legislative history of RCW 51.32.180(b) and our case law support the conclusion an occupational disease may be compensable according to the date of last injurious exposure when that date coincides with the date of manifestation, as in the case of cumulative trauma injuries like occupational hearing loss.
¶ 21 Before 1988, the legislature provided merely that disabilities resulting from occupational diseases are compensable in the same manner as those resulting from injuries. See former RCW 51.32.180 (1988); RCW 51.16.040. The first occupational diseases covered by the IIA were gradual onset injuries caused by cumulative trauma. Laws of 1937, ch. 212, § 1(19), at 1033 (allowing compensation for disabling joint inflammation that results from "continuous rubbing, pressure or vibration of the parts affected"); Dennis v. Dep't of Labor & Indus., 44 Wash. App. 423, 722 P.2d 1317 (1986), aff'd, 109 Wash.2d 467, 745 P.2d 1295 (1987). The common law standard for determining the date of occurrence for such occupational diseases was the last date of injurious exposure or the last day worked, on the theory the injury continued so long as the worker was exposed to the injurious workplace conditions and the injury became disabling when the worker could no longer work. See Schurlknight v. City of North Charleston, 352 S.C. 175, 178, 574 S.E.2d 194 (2002); Bldg. Materials Corp. v. Britt, 211 S.W.3d 706, 712 (Tenn.2007) ("gradually occurring injuries are a new injury each day"; adopting last-date-worked rule as the date of injury for cumulative trauma injuries).
*1016 ¶ 22 When an occupational disease involves a gradual onset disability resulting from cumulative trauma, fixing compensation according to the last day worked or the last day of injurious exposure usually compensates disabilities resulting from occupational disease comparably to disabilities resulting from industrial injuries. This is because an occupational disease resulting from cumulative trauma is similar to an industrial injury in that the timing of the disability generally coincides with the timing of the injury-causing event.[5]
¶ 23 In the case of a long-latency occupational disease, however, the last injurious exposure rule does not fulfill the statutory purpose of compensating diseases and injuries equally but results in application of an out-dated schedule of benefits. Landon, 117 Wash.2d at 127, 814 P.2d 626.
¶ 24 In order to remedy the inequity, many jurisdictions adopted the date of manifestation rule in place of the last injurious exposure rule for identifying the date of occurrence for disability resulting from long-latency diseases. See 3 Larson, supra, § 53.05 (overwhelming majority of states reject last injurious exposure rule in favor of date of disability, knowledge, or manifestation for determining applicable schedule of benefits in occupational disease claims).
¶ 25 Our board of industrial insurance appeals adopted the date of manifestation rule. In re Wilcox, No. 69,954 (Wash. BIIA May 30, 1986); In re Weil, No. 86 2814, at 4 (Wash. BIIA Nov. 30, 1987) ("If occupational disease and injury claims are to be treated the same for purposes of computing compensation, then the computation of benefits must be tied to the point in time when both events have occurred, i.e., the occupational event or exposure, and some resulting condition.") ("injury" encompasses two distinct elements: a "`tangible happening,'" and "`an immediate or prompt result'"). The board's decision was followed by both the legislature when it enacted the 1988 amendment to RCW 51.32.180(b), Laws of 1988, ch. 161, § 5, and followed by this court. Kilpatrick v. Dep't of Labor & Indus., 125 Wash.2d 222, 228, 883 P.2d 1370, 915 P.2d 519 (1994) (statutory language, "totally or partially disabling," is synonymous with common law "date of manifestation" rule); Landon, 117 Wash.2d 122, 814 P.2d 626; see also Nygaard v. Dep't of Labor & Indus., 51 Wash.2d 659, 661-62, 321 P.2d 257 (1958) (bronchial asthma caused by workplace exposure became a "compensable disability" when it caused the worker to "collapse" and "miss work," not when it first developed, years earlier); Plese v. Dep't of Labor & Indus., 28 Wash.2d 730, 183 P.2d 1001 (1947) (holding that a worker suffering from silicosis was entitled to compensation according to the date the disease caused him to quit work, not the date of diagnosis).
¶ 26 We decline to interpret RCW 51.32.180(b) in a manner that leads to the absurd result of compensating an injured worker according to benefit levels in effect before the injurious exposure that caused the disability at issue. The purpose of the 1988 amendment to RCW 51.32.180(b) was to compensate workers appropriately for disabilities that arise after the date of last injurious exposure. The 1988 amendment cures the inequity that results when there is a long delay between injurious cause and injurious effect by requiring compensation to be determined according to the time a worker experiences the actual disabling effects of an occupational disease. However, the legislature did not intend to reduce benefits for workers whose compensable disability coincides with the date of last injurious exposure, as in the *1017 case of gradual onset cumulative trauma injuries like occupational hearing loss.
¶ 27 Other jurisdictions that reject the last injurious exposure rule as applied to long-latency diseases continue to apply it in determining compensation for cumulative trauma disabilities, including occupational hearing loss.[6]See Ramey v. Stevedoring Servs. of Am., 134 F.3d 954, 960 (9th Cir.1998) (date of last injurious exposure determines benefits for occupational hearing loss under Longshore and Harbor Workers' Compensation Act); Discher v. Indus. Comm'n, 10 Wis.2d 637, 103 N.W.2d 519 (1960) (date of wage loss or last day worked is date of injury for occupational diseases, including hearing loss); Berry v. Boeing Military Airplanes, 20 Kan. App.2d 220, 885 P.2d 1261 (1994) (adopting last date worked as date of occurrence for carpal tunnel syndrome after taking account of its "hybrid" nature as injury/disease); Barker v. Home-Crest Corp., 805 S.W.2d 373 (Tenn.1991) (date an employee is no longer able to work is the date of injury for carpal tunnel syndrome).
¶ 28 In Bath Iron Works, the Supreme Court found it "quite proper" and not inconsistent with congressional intent to determine the time of injury in occupational hearing loss cases as the time of last injurious exposure, considering the nature of the disease process:
The injury, loss of hearing, occurs simultaneously with the exposure to excessive noise. Moreover, the injury is complete when the exposure ceases. Under those circumstances, we think it quite proper to say that the date of last exposurethe date upon which the injury is completeis the relevant time of injury for calculating a retiree's benefits for occupational hearing loss.
Bath Iron Works, 506 U.S. at 165, 113 S.Ct. 692; see also Railco Multi-Constr. Co. v. Gardner, 564 A.2d 1167 (D.C.App.1989) (date of compensation for occupational hearing loss fixed by date cumulative loss occurred, not date first loss occurred); John Deere Dubuque Works of Deere & Co. v. Weyant, 442 N.W.2d 101, 105 (Iowa 1989) (date of occurrence of occupational hearing loss is date of last exposure to injurious noise, whether due to retirement, termination, or transfer from excessive noise exposure) (citing Iowa Code § 85B.8); Green Bay Drop Forge Co. v. Indus. Comm'n, 265 Wis. 38, 60 N.W.2d 409 (1953) (occupational hearing loss compensable as of last day worked); Ciavarro v. Despatch Shops, Inc., 22 A.D.2d 312, 255 N.Y.S.2d 48 (1964) (date of disability for occupational hearing loss is last day worked, per statute).
¶ 29 RCW 51.16.040 requires that occupational diseases are compensable "in the same manner" as injuries. Compensating occupational hearing loss according to the date of last injurious exposure better fulfills this statutory mandate. In the case of successive injuries to the same body part, whether the worker is entitled to a new schedule of benefits for the aggravation of a prior injury depends on whether the aggravation was proximately caused by subsequent workplace conditions. See In re Tracy, No. 88 1695 (Wash. BIIA Feb. 2, 1990). When an aggravation is not caused by subsequent conditions, the original schedule of benefits applies. But if subsequent workplace conditions contributed to the successive injury, the worker is entitled to a new schedule of benefits.
¶ 30 Because new hearing loss arises from a worker's exposure to injurious noise, some portion of Harry's compensable loss is attributable to his last exposure to hazardous workplace noise. Fixing compensation for his aggregate hearing loss according to the date a compensable disability first occurred would undercompensate him for his post-1974 disability. Considering the liberal construal mandate, we must resolve the case in favor of the injured worker.
*1018 ¶ 31 The last injurious exposure rule prevents an employer from apportioning responsibility for an occupational disease claim. Under the last injurious exposure rule, an employer is responsible for the aggregate disability to which it contributed. See WAC 296-14-350; Tri, 117 Wash.2d at 130, 814 P.2d 629.[7]
¶ 32 The Court of Appeals reasoned that compensating Harry according to the present value of his entire disability would amount to a "windfall." We disagree. This is not a case where a worker negligently or deliberately failed to file a claim. There is no evidence in the record that Harry received notice from a healthcare provider that he had a compensable disability, which would have triggered the statute of limitations for his occupational hearing loss. See RCW 51.28.055 (occupational disease claim timely only if filed within two years after receiving notice from a healthcare provider of the existence of a compensable loss; additionally, a claimant filing more than two years after the date of last injurious exposure is entitled only to medical benefits, not a permanent partial disability award, for occupational hearing loss). Therefore, Harry is entitled to compensation for his entire disability. Cf. In re Lovell, No. 69,823 (Wash. BIIA Nov. 25, 1986) (worker precluded from claiming benefits for preexisting hearing loss that occurred before statute of limitations ran on claim); In re Burrill, No. 47 766 (Wash. BIIA Dec. 13, 1977) (allowing claim for hearing loss arising after the date the statute of limitations ran on preexisting hearing loss).[8]
¶ 33 This result is not inequitable to the employer, which could have reduced its liability by providing Harry with a physician-certified notice of compensable hearing loss. Buse was aware of the existence of Harry's occupational hearing loss as it occurred. Although it had no obligation to inform Harry he had a compensable loss, Buse cannot complain his failure to file a claim deprived it of notice of its potential obligation to pay benefits or the opportunity to make its workplace safer.
¶ 34 A core purpose of the IIA is to allocate the cost of workplace injuries to the industry that produces them, thereby motivating employers to make workplaces safer. This purpose is not well served by applying a schedule of benefits in effect long before the injurious workplace exposure occurred. Thus, in addition to being grossly unfair to injured workers like Harry, the Department's handling of occupational hearing loss claims undermines a primary purpose of the IIA because the compensation awards do not accurately reflect the cost of workplace injuries. The legislature never intended this inequitable, illogical, and absurd result when it amended RCW 51.32.180.
*1019 ¶ 35 According to the record, Donald Harry was exposed to injurious noise throughout his employment, yet his occupational hearing loss did not require medical treatment before retirement. He is entitled to compensation for his permanent partial disability according to the schedule of benefits in effect on the date of his retirement.

CONCLUSION
¶ 36 We affirm the Court of Appeals' reversal of the Department's order applying the 1974 schedule of benefits to Harry's 2001 permanent partial disability claim for occupational hearing loss. Occupational hearing loss that does not require medical treatment before retirement is compensable according to the schedule of benefits in effect on the date occupational noise last contributed to the disability for which a worker seeks compensation. We reverse the Court of Appeals holding that Harry is not entitled to compensation for his entire disability and remand for further proceedings consistent with this opinion. Because he has prevailed here, Harry is entitled to reasonable attorney fees, per RCW 51.52.130.
WE CONCUR: C. JOHNSON, SANDERS, CHAMBERS, OWENS, and STEPHENS, JJ.
FAIRHURST, J. (dissenting).
¶ 37 The legislature has provided an unambiguous mechanism for establishing compensation benefits for claims resulting from progressive hearing loss. While that scheme may not be optimal, the legislature has made its decision about which schedule of benefits will be used. The majority, however, claims the statutory prescriptions are ambiguous and has fashioned its own new rule without statutory authority and contrary to case law. Because this attempt to remedy a perceived inequity usurps the role of the legislature and is strained, I respectfully dissent.
¶ 38 Benefits to workers injured on the job are statutorily governed by Title 51 RCW, the Industrial Insurance Act (IIA). For occupational diseases, the plain language of RCW 51.32.180(b) clearly states how to calculate benefits: "the rate of compensation for occupational diseases shall be established as of the date the disease requires medical treatment or becomes totally or partially disabling, whichever occurs first, and without regard to the date of the contraction of the disease or the date of filing the claim."
¶ 39 When construing a statute, we first look to the plain meaning of the statute. "The `plain meaning' of a statutory provision is to be discerned from the ordinary meaning of the language at issue, as well as from the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." State v. Jacobs, 154 Wash.2d 596, 600, 115 P.3d 281 (2005) (quoting Wash. Pub. Ports Ass'n v. Dep't of Revenue, 148 Wash.2d 637, 645, 62 P.3d 462 (2003); Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 10-11, 43 P.3d 4 (2002)). If not otherwise defined by statute, the ordinary meaning includes the dictionary definition. Campbell & Gwinn, 146 Wash.2d at 9, 11, 43 P.3d 4; Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 11 P.3d 762, 27 P.3d 608 (2000). If a statutory provision is subject to more than one reasonable interpretation, it is ambiguous. Jacobs, 154 Wash.2d at 601, 115 P.3d 281. Any ambiguity in the language of the IIA must be resolved in favor of the injured worker. RCW 51.12.010; Cockle v. Dep't of Labor & Indus., 142 Wash.2d 801, 811, 16 P.3d 583 (2001).
¶ 40 There is no disagreement in this case over the operative portion of the statute when the disease becomes partially disabling. "[B]ecome" is defined as:
1 a obs (1): COME (2): GO ... b (1): to come to exist or occur (2): to emerge as an entity: grow to manifest a certain essence, nature, development, or significance ... c archaic: to come to experienceused with an infinitive 2 a: to pass from a previous state or condition and come to be: grow or change into being through taking on a new character or characteristic ... b: to take on a new role, essence, or nature and come to be ... c: to come to beused as an auxiliary in passive constructions ... 3 a: HAPPEN.
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 195 (2002). While the term "partially disabling" is not defined by statute, RCW 51.08.150 defines "`[p]ermanent partial disability'" *1020 as "the loss of either one foot, one leg, one hand, one arm, one eye, one or more fingers, one or more toes, any dislocation where ligaments were severed where repair is not complete, or any other injury known in surgery to be permanent partial disability." This definition focuses on the loss of bodily function rather than the inability to perform one's job functions, and it includes both monaural and binaural hearing loss. Clauson v. Dep't of Labor & Indus., 130 Wash.2d 580, 585, 925 P.2d 624 (1996); RCW 51.08.150; RCW 51.32.080(1)(a). The statute uses the present participle form of disabledisabling; it does not use the past participle form of the termdisabled. The tense is important because the term "disabled" implies a completed action while "disabling" implies that the disability merely exists. Putting the definitions together, the plain meaning of the statute is that the compensation rate is based when the loss of bodily function components of the disease come to exist. See WAC 296-14-350(3); Boeing Co. v. Heidy, 147 Wash.2d 78, 88, 51 P.3d 793 (2002); Dep't of Labor & Indus. v. Landon, 117 Wash.2d 122, 124 n. 1, 814 P.2d 626 (1991). Thus, the rate of compensation is based when the bodily loss first exists. Given the precise wording of the statute and the particular tenses of the words used, I cannot see another reasonable reading of this statute.
¶ 41 At the time of Donald Harry's first audiogram in 1974, he had a 5.6 percent monaural loss of his hearing and had a permanent partial disability. Harry's occupational disease first came to be because of that test, and thus, his rate of compensation should be based on the schedule in effect on that date. The plain meaning of the statute dictates that the rate of compensation for Harry's occupational monaural hearing loss is 1974, when Harry first lost his hearing.[1]
¶ 42 The majority, however, concludes that the term "becomes ... partially disabling" is ambiguous. RCW 51.32.180(b). It provides no explanation of how the term is ambiguous or what competing reasonable interpretations are at play. Instead, the majority argues that the plain-meaning interpretation advanced by petitioners is untenable because the outcome is that a compensation rate will be set before a worker's subsequent exposure to injurious occupational noise causes further occupational hearing loss.[2] Majority at 1014. While the majority may be correct as a matter of economic fairness that it may not be appropriate to compensate a victim of occupational disease at a rate that went into effect nearly four decades before he is compensated, that is the province of the legislature, not this court.[3] Determinations on what would be a more equitable economic outcome are not grounds for overriding the clear meaning of the law. That the legislature's result does not comport with this court's notion of perfect equity does not necessitate the construction of a legal fiction to plug a nonexistent ambiguity.
¶ 43 The majority argues that the interpretation proposed by petitioners would lead to absurd results. Id. at 1016. This court has held that if a literal interpretation of a statute is absurd, the statute is ambiguous and *1021 the court will move on to examine the legislative history and use judicial canons of statutory interpretation. State v. Taylor, 97 Wash.2d 724, 729-30, 649 P.2d 633 (1982); In re Det. of Martin, 163 Wash.2d 501, 509-13, 182 P.3d 951 (2008). Contrary to the majority's holding, the type of absurdity that causes a statute to be ambiguous is not when there are any absurd policy results from the plain meaning of the statute. Rather, a statute is absurd, and thereby ambiguous, if its plain meaning is directly inconsistent with its statutory purpose or with another statute so as to render either of the statutes meaningless.[4]See Martin, 163 Wash.2d at 509-13, 182 P.3d 951. In this case, the purpose of the statute is to set the rate of compensation, which it does. The plain meaning of the statute does not contradict another statute in the IIA. Despite policy concerns, the plain meaning of the statute must be given effect.
¶ 44 In addition to creating this rule on its own and going against the plain meaning of the statute, the majority relies upon case law that does not support its conclusion. Regarding Washington cases, the majority discusses Landon, 117 Wash.2d at 127, 814 P.2d 626, in explaining its interpretation of RCW 51.32.180(b). In Landon, we held that for claims resulting from asbestosis filed before the 1988 amendments to RCW 51.32.180(b), the date of manifestation rule should apply because the last injurious rule would not fulfill the then-existing statutory purpose of compensating diseases and injuries equally. Landon, 117 Wash.2d at 124-26, 814 P.2d 626. With regard to the 1988 amendments, this court explained that the legislature rejected the last injurious exposure rule in favor of the date of manifestation rule. Id. at 127, 814 P.2d 626. The majority uses the pre-1988 amendment analysis to support its conclusion, but regarding the statements about the current statute, the majority dismisses those statements because Landon dealt with a long-latency disease rather than a cumulative trauma disease. Majority at 1015. The majority's distinction is flawed. The distinction could be made for claims made before the 1988 amendments when the statutes simply stated that diseases were to be treated the same as injuries. Landon, 117 Wash.2d at 124, 814 P.2d 626; former RCW 51.32.180 (1977). That distinction cannot be made, however, when the legislature changed the statute and adopted the date of manifestation rule. If anything, Landon's statement regarding the 1988 amendments to former RCW 51.32.180 support the conclusion that the date of manifestation rule applies.
¶ 45 Similarly, the majority's citation to several cases from foreign jurisdictions that have applied the last injurious exposure rule is misleading. In none of those cases was the court interpreting a statute remotely similar to RCW 51.32.180(b). In Discher v. Industrial Commission, 10 Wis.2d 637, 103 N.W.2d 519 (1960); Berry v. Boeing Military Airplanes, 20 Kan.App.2d 220, 885 P.2d 1261 (1994); Railco Multi-Construction Co. v. Gardner, 564 A.2d 1167 (D.C.1989); John Deere Dubuque Works of Deere & Co. v. Weyant, 442 N.W.2d 101 (Iowa 1989); and Green Bay Drop Forge Co. v. Industrial Commission, 265 Wis. 38, 60 N.W.2d 409 *1022 (1953), all the courts were interpreting statutes that based compensation on the terms "date of injury" or "date of accident." In Ciavarro v. Despatch Shops, Inc., 255 N.Y.S.2d 48, 22 A.D.2d 312, 314 (N.Y.App. Div.1964), the court was interpreting a statutory scheme that explicitly explained that compensation for occupational hearing loss became due and payable six months after separation from work and the last day of work shall be the date of disablement. In Barker v. Home-Crest Corp., 805 S.W.2d 373 (Tenn.1991), the court examined its state common law in applying the last injurious exposure rule. Finally, in Bath Iron Works Corp. v. Office of Workers' Compensation Programs, 506 U.S. 153, 113 S.Ct. 692, 121 L.Ed.2d 619 (1993) and Ramey v. Stevedoring Services of America, 134 F.3d 954 (9th Cir.1998), the courts were interpreting the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, and examined what constituted the time of injury as applicable to that statutory regime. If Washington's statutory scheme used the same terminology, those cases might be helpful in determining the meaning of our statute. However, none of those cases interpret a statute similar to RCW 51.32.180(b). As such, those cases are unhelpful to our examination of the specific terminology of our statutes.
¶ 46 Finally, while the majority contends that employing the date of manifestation rule would be absurd, its own analysis belies the argument. In response to the argument that compensating Harry according to the present value of his entire disability would amount to a "`windfall,'" the majority contends that Harry did not deliberately fail to file the claim, act negligently, or receive notice that he had a compensable disability. Majority at 1018. While all of those facts are true, those facts go toward Harry's motives in filing the compensation claim and the calculation of the running of the statute of limitations. Harry's motives do not matter for purposes of determining which compensation schedule to use, and the statute of limitations provision has different wording. In a footnote, the majority notes that it is possible to segregate the compensation rate of a prior permanent partial disability based on reliable medical evidence. Id. at 1018 n. 7. Noticing that the compensation rate could be adjusted based upon an earlier schedule, the majority at least implicitly notes the policy concern of a windfall. Thus, while it is not dispositive to determining the plain meaning of a statute, the majority recognizes it is possible that the legislature drafted RCW 51.32.180(b) as it did to protect companies from having to pay a windfall to workers. There may be better ways to protect companies from having to pay a windfall to workers, but the legislature unambiguously wrote a policy to achieve that purpose.
¶ 47 Occupational hearing loss is, indeed, a factually unique affliction that may not comport perfectly with existing statutory remedies and, as such, may not compensate all victims equitably. Such a determination rightfully belongs to the legislature, and this court should not infringe on the rightful territory of our coordinate branch. Because the manner in which the majority reaches its conclusion is in opposition to existing law and usurps the role of the legislature, I dissent.
WE CONCUR: ALEXANDER, C.J., and J. JOHNSON, J.
NOTES
[1] RCW 51.08.150 provides: "`Permanent partial disability' means the loss of either one foot, one leg, one hand, one arm, one eye, one or more fingers, one or more toes, any dislocation where ligaments were severed where repair is not complete, or any other injury known in surgery to be permanent partial disability."
[2] The Court of Appeals criticized this court's characterization of occupational hearing loss as a "disease" rather than an "injury," finding it counterintuitive considering the condition results from cumulative trauma. Harry, 134 Wash.App. at 745 n. 14, 171 P.3d 1058. Occupational hearing loss may be compensable either under a "repeated impact theory" of injury or as an "occupational disease." 3 Arthur Larson, Larson's Workers' Compensation Law § 52.05 (2007) (collecting cases). Although occupational hearing loss is unlike long-latency diseases resulting from exposure to toxic substances, such as silicosis, it is similar to other gradual-onset diseases caused by repeated impacts, e.g., bursitis and carpel tunnel syndrome. The majority of jurisdictions classify hearing loss as a disease because it lacks the time-definiteness of an industrial injury and is similar to other cumulative trauma disabilities arising from repetitive trauma. See Miller v. Amalgamated Sugar Co., 105 Idaho 725, 728, 672 P.2d 1055 (1983) (hearing loss is a disease, not an injury) (collecting cases); Marie v. Standard Steel Works, 319 S.W.2d 871, 878 (Mo. 1959) (classifying hearing loss as a disease, while stating, "`We attempt no scientifically exact discrimination between accident and disease, or between disease and injury. None perhaps is possible, for the two concepts are not always exclusive, the one or the other, but often overlap.'" (quoting Connelly v. Hunt Furniture Co., 240 N.Y. 83, 147 N.E. 366, 367-68 (1925))); Travelers Ins. Co. v. Cardillo, 225 F.2d 137 (2d Cir.1955) (hearing loss determined to be occupational disease under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901); 3 Larson, supra, § 52.05. Occupational hearing loss is unusual in that it is a permanent condition, and the extent of disability is readily ascertainable by audiogram. In this respect, it is unlike most injuries as well as most diseases.

In any event, the distinction between injury and disease is no longer relevant for purposes of providing compensation and benefits. RCW 51.16.040 ("The compensation and benefits provided for occupational diseases shall be paid and in the same manner as compensation and benefits for injuries under this title."); see Dennis, 109 Wash.2d at 472-73, 745 P.2d 1295 (discussing IIA's historical evolution from "no coverage" of diseases to broad coverage).
[3] RCW 51.32.080(1)(a) lends support to our conclusion. Under that provision, unilateral hearing loss is statutorily defined as a distinct permanent partial disability from binaural hearing loss. See RCW 51.32.080(1)(a). Thus, Harry's 1974 unilateral hearing loss could not constitute the date his binaural hearing loss became partially disabling. See In re Lovell, No. 03 16736 (Wash. BIIA Feb. 23, 2005) (the date a unilateral hearing loss occurs is not the date binaural hearing loss becomes partially disabling).
[4] Nor is the result here controlled by Heidy, 147 Wash.2d 78, 51 P.3d 793. In Heidy, this court held, "a worker's knowledge of his or her disabling condition does not affect when the rate of compensation is established." Rather, the rate of compensation is established when "the disease requires medical treatment or becomes totally or partially disabling, whichever occurs first." Id. at 88-89, 51 P.3d 793 (quoting RCW 51.32.180(b) and citing Landon, 117 Wash.2d at 124, 814 P.2d 626). This court's holding that the knowledge requirement is unsupported by the statute does not compel the conclusion occupational hearing loss is "disabling" for purposes of RCW 51.32.180(b) upon the first occurrence of some ratable disability. The Board's knowledge requirement did not affect the rate of compensation in Heidy. See 147 Wash.2d at 83, 51 P.3d 793 (noting the schedule of benefits was the same, with or without a knowledge requirement). To the extent Heidy suggests occupational hearing loss is compensable according to the first rather than the last date hazardous noise contributed to the compensable disability, we disapprove it.
[5] Even in the case of an industrial injury, the date of disability controls the applicable rate of compensation, and is not necessarily equivalent to the date of accident. See In re Walker, No. 93 6528 (Wash. BIIA July 24, 1995) (where date of disability does not coincide with date of injury, date of disability controls the schedule of benefits). Injury is defined as "the physical conditions" that result from a "sudden and tangible" traumatic event. Physical conditions may manifest, resulting in disability, more than one year following an industrial accident. Crabb v. Dep't of Labor & Indus., 186 Wash. 505, 508, 58 P.2d 1025 (1936) (allowing claim when disabling effect of industrial injury develops more than one year following accident); Nelson v. Dep't of Labor & Indus., 9 Wash.2d 621, 115 P.2d 1014 (1941) (allowing reopening of claim where disability occurred more than one year after accident); RCW 51.32.160 (authorizing adjustment in rate of compensation for aggravation of disabilities).
[6] Other jurisdictions calculate benefits for occupational hearing loss according to the "last day of work," the date of "incapacitation," or the date of "disablement." The parties have drawn our attention to no case, and our research reveals none, where the date of injury for purposes of a permanent partial disability award is established as of the date any compensable hearing loss first occurs. Instead, most jurisdictions deem the date of occurrence as the date the injury is complete, i.e., the date of last injurious exposure.
[7] This case does not involve, and therefore we do not address, the circumstances under which a worker's prior permanent partial disability may be segregated based on reliable medical evidence. See RCW 51.32.080(5) (formerly RCW 51.32.080(3) (1988)); Heidy, 147 Wash.2d at 86, 51 P.3d 793 (absent reliable medical evidence, age-related hearing loss may not be segregated from noise-related hearing loss; employers must "bear the burden of an imperfect science"); cf. Miller v. Dep't of Labor & Indus., 200 Wash. 674, 684, 94 P.2d 764 (1939) (segregation applies when a worker "already is, in fact, permanently partially disabled" but does not apply when the preexisting condition was not a compensable disability).
[8] The Court of Appeals dismissed the Department's concern a tiered compensation remedy would unduly complicate the adjudication of a hearing loss claim, stating "the Department must simply do a little more math." Harry, 134 Wash. App. at 749, 171 P.3d 1058. A tiered award may indeed be impracticable. It is well established permanent hearing loss cannot be measured validly until the worker has been removed from the noisy environment for a particular period of time. See 3 Larson, supra, § 52.05[2] (discussing the "removal-from-noise" requirement); 2 Modern Workers Compensation § 109:25, at 46-47 (1993) (collecting cases). The current protocol requires 18 hours of removal from noise to take account of "temporary threshold shifts." According to the record in this case, Harry's industrial audiograms were administered during lunch breaks. Thus, it is questionable whether they could reliably measure the actual extent of his incremental hearing loss, as opposed to merely establishing the loss exceeded the American Medical Association threshold for some compensable disability. For this reason, the Department relies on clinical audiograms to rate the extent of permanent partial disability, although industrial audiograms are not per se unreliable. See Heidy, 147 Wash.2d at 87, 51 P.3d 793 (reliability of industrial audiograms to be determined by factfinder).
[1] It may be that Harry suffered from two different kinds of diseasemonaural and binaural hearing lossand, thus, has two separate compensation schedules. The first schedule would be compensation for monaural hearing loss that existed in 1974 and went to 1986. The second schedule would compensate Harry for the binaural hearing loss that existed from 1986 to present. However, because Harry never raised this argument below and only made one compensation request for occupational hearing loss, it is not appropriate for this court to step in and bifurcate Harry's compensation.
[2] Under the majority's reasoning, claimants with medically untreatable partial disabilities are advantaged as compared to those with diseases that are medically treatable. The claimants with medically untreatable partial disabilities can now wait to file their claim for benefits for the highest possible rate while the claimants with treatable disabilities will still be subject to the earlier schedule of benefits. I do not believe that the plain meaning of the statute accords such disparate treatment.
[3] Pollard v. Weyerhaeuser Co., 123 Wash.App. 506, 98 P.3d 545 (2004), does not aid Harry. In Pollard, the Court of Appeals held that if a person files subsequent claims for further occupational hearing loss, then the rate of compensation is based on when the person filed the previous claim. Id. at 514, 98 P.3d 545. Here, as Harry only filed one claim for occupational hearing loss, he cannot benefit from the holding in Pollard.
[4] This analytical framework makes sense given that our justification for avoiding absurd results is that we presume the legislature was rational and did not intend absurd results in drafting the statute. State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003) (citing State v. Delgado, 148 Wash.2d 723, 733, 63 P.3d 792 (2003) (Madsen, J., dissenting)). It is also why we have described the standard as avoiding "unlikely, absurd, or strained consequences." Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles, 148 Wash.2d 224, 239, 59 P.3d 655 (2002). For instance, in Tingey v. Haisch, 159 Wash.2d 652, 664, 152 P.3d 1020 (2007), this court noted that while the plain meaning of the term "account receivable" in a statute led to a substantial effect on the ability to collect business debt, it was not tantamount to an absurd result. The operative effect of the statute was not absurd because all of the related statutes could still be given effect and because it was clear the legislature had considered such impacts in its drafting of the statute. Id. In holding that the operative effect of a narrower definition of "account receivable" would lead to absurd results, we noted that such an interpretation would be standardless and affect other statutory schemes. Id. at 665, 152 P.3d 1020. Thus, while courts look to the operative effect of a literal meaning of the statute, they are not to depart from that plain meaning unless the legislature could not have rationally intended the results. Simply because the court does not like the policy consequences of a literal interpretation does not mean that the legislature could not have rationally intended those results.